## The People v. the Regents of the University.

*Legislative interference with University: Validity: Homœopathic professorship: Constitutional law.* A law passed in 1855, (*L. 1855, p. 232*) assumed to limit the power of the regents to regulate and manage the university, by enacting the following proviso: "*Provided*, that there shall always be at least one professor of homœopathy in the department of medicine."

Application having been made for a *mandamus* to compel the appointment of such a professor, the writ was not granted: the court being equally divided upon the question whether the legislature had power under the constitution to exercise any such control over the regents, who are vested with "the general supervision of the university, and the direction and control of all expenditures from the university interest fund."— *Const. Art. 13, § 8.*

*Heard January 5. Decided May 13.*

Motion for *mandamus* against the Regents of the University of Michigan.

The petition set forth that the present constitution of said state, by Article XIII, section 6, constitutes the Regents of the University of the State of Michigan, the Board of Regents of the University of Michigan; and by section 7 of the same Article, constitutes them a body corporate, known by the name and title of the Regents of the University of Michigan.

That the Legislature of said State, after the adoption of the constitution aforesaid, by section 5, entitled, An Act to provide for the government of the State University, and to repeal chapter 57 of the revised statutes of eighteen hundred and forty-six, approved April eighth, eighteen hundred and fifty-one, ordained as follows, viz: The Regents (meaning the Regents of said University,) shall have power to enact ordinances, by-laws and regulations for the government of the University, to elect a President, to fix, increase

and reduce the regular number of professors and tutors, and to appoint the same, and to determine the amount of their salaries.

That said Legislature still subsequently, by an act entitled An Act to amend an act, entitled "An Act to provide for the government of the State University, and to repeal chapter fifty-seven of the revised statutes of eighteen hundred and forty-six, approved April eighth, eighteen hundred and fifty-one," (which said act was approved February twelfth, eighteen hundred and fifty-five,) amended said section five, by adding thereto the following words, viz: "provided that there shall always be at least one professor of homeopathy in the department of medicine."

That although the enactment above referred to is imperative upon the said Regents of the University of Michigan, to appoint such Professor of Homeopathy in said department of medicine, at least within a reasonable time after the passage of said last act; and although nearly thirteen years have elapsed since the approval of said act; and although there was not at the time of such approval, and has never been since, any Professor of Homeopathy in said department of medicine; and although the said regents as a board or corporation, have often been petitioned and asked by citizens and residents of this state, as petitioner is informed and believes, to make the appointment of such professor, and thus carry into effect said law, yet the said board, or corporation of regents, have hitherto wholly neglected and refused and still do neglect and refuse, to make such appointment, in direct violation of said act, and of duty imposed upon them thereby; and have never, at any time, since the passage of said act, and the time it became operative, made any appointment of a professor of homeopathy in the department of medicine in said University, and as your petitioner is informed and believes are taking no steps to carry out and accomplish the true intent and meaning of said act."

The petition then concludes with the usual prayer for a *mandamus*.

The answer of the respondents, sets forth that by the provisions of the Constitution of the State of Michigan, they have the general supervision of the University of said State, and the direction and control of all expenditures from the said University interest fund; that the salaries of all professors in said University are payable wholly from said University interest fund; and these defendants claim and insist that it is their right, and their duty to determine what professors shall be appointed in said institution of learning; when the same shall be appointed, the amount of their respective salaries, and the several times when the same shall become due and payable. And they further insist that the provision of said act of the legislature of the State of Michigan referred to in said petition, which was approved February 12, 1855, and which provides, "that there shall always be at least one professor of homeopathy in the department of medicine," does not make it imperative upon these defendants that they should appoint such professor at any particular time, or that they should pay any appointee to such professorship out of the said University interest fund; and that a decision making such appointment mandatory upon these defendants would be in conflict with section eight of article thirteen, of the constitution of the State.

That the Medical Department of the University is located at Ann Arbor, in said State, and that it numbers between three hundred and four hundred medical students, and is at present, and for several years past has been in a very flourishing condition; that these defendants have earnestly sought to act for the best interest of said department, and for the continued and lasting prosperity of said University in all its various departments; that a very careful consideration of the question as to the wisdom of appointing such a professor of homeopathy, to be an instructor in the medical department at Ann Arbor, has fully convinced

these defendants that such an appointment would be greatly prejudicial to the best interests of said University; that it would engender discord and strife therein, and drive therefrom nearly all medical professors and students now therein; and they admit, therefore, that they have neglected and refused to make such appointment, under the belief that they had a clear and legal right so to do.

That they are desirous of carrying out the expressed wishes of said legislatuie, so far as they .can do so with safety to the best interests of the University under their charge, even though the said act of the legislature be not binding upon these defendants, and to that end and purpose they have proposed to establish a medical department of said University at some other place than Ann Arbor, in which the principles and practice of homeopathy shall be taught; and they are ready and desirous to establish such department, and to appoint one or more professors therein, as soon as they shall have the power and authority so to do, and the financial condition of said University shall warrant the additional expense, which shall thereby be incurred.

That they have at the present time no funds in the treasury of said University, unappropriated, out of which the salary of a professor of homeopathy in the medical department thereof, could be paid; and they further say, that the present income of said University is all absorbed in the payment of the salaries of professors already legally appointed, and the incidental expenses necessarily incurred in carrying on the several departments thereof."

*Dwight May, Attorney General,* furnished no printed brief.

*D. Darwin Hughes,* for relator.

The motion is for a *mandamus,* to compel the regents to appoint a professor of homeopathy in the department of

medicine of the University, in pursuance of the act of the legislature of February 12, 1855. — *Comp. L. 2,187.*

1. It is a fundamental rule of constitutional law that an act of the legislature, not prohibited by express words, or by necessary implication, cannot be declared void, as a violation of the constitution, and in cases of doubt, every possible presumption not clearly inconsistent with the language, and the subject matter is to be made in favor of the constitutionality of state legislation. — *Sears v. Cottrell, 5 Mich. 251; Twitchell v. Blodgett, 13 Mich. 162.*

If the law and the constitution can in any reasonable manner be reconciled with each other, then the law must stand.

There is abundant reason and judicial authority to show that there is at least great doubt whether the power of the legislature to make this law has been taken away by the constitution. — *People v. The Regents, 4 Mich. 105.*

2. There is nothing in the constitution, taken according to its plain and obvious meaning, which invalidates this law.

That instrument recognized and affirmed certain powers which had been conferred upon the regents by the legislature, and, among other things, provided that the regents should have the "general supervision of the University, and the direction and control of its expenditures from the interest fund." — *Const. Art. 13, § 8.*

Supervision is the act of overseeing; inspection, superintendence. — *Webster's Dictionary.*

Control, is power, authority, government and command. — *Ib.*

It is apparent enough that the two words, as used in this section, mean the same thing, and that the regents are given the same power over the University itself as they are over the disbursement of its funds.

The word "control" when applied to the expenditure, cannot be construed as placing the University fund at the

absolute disposal of the regents, independent of the legislature.

The sense in which the Constitutional Convention used the word "supervision" is clearly shown by the first section of the article on education, where it provides that "The Superintendent of public Instruction shall have the general supervision of public instruction, and his duties shall be prescribed by law." Here the same words are used, giving power to the Superintendent of Public Instruction over the whole system of State instruction, of which the University is a part, which are used in giving power to the regents of the University, and if the argument is good, that these words make the regents independent of the legislature, then it logically follows that they, to the same extent, and in the same manner, place the regents under the absolute control and dispensing power of the superintendent, a state of things that will scarcely be conceded by any one.

The first section, while it gives to the superintendent the general supervision of public instruction, also provides that his duties should be prescribed by law, showing clearly that within the meaning of the convention a "general supervision" is not inconsistent with absolute control in the legislature, and that such supervision should be in all respects under the direction and control of the legislature.

3. Such a construction as is contended for by the regents, brings the constitution in conflict with the declaration of the trust under which the University lands were granted to the State, while it should be so construed as to harmonize with and carry into effect that grant. It is manifest that the Constitutional Convention should be understood as speaking in accordance with the terms of such grant, and the constitution should be construed as violating its terms or spirit if it can in any way be avoided.

The first reservation of lands for a fund for this University was in 1804. — *2 U. S. Stat. p. 277.*

It was made final in 1826, — *4 Id. 180.*

In 1836, Congress, by an ordinance, proposed to cede the lands to the State as follows:

"1. Section sixteen in every township for the use of schools."

This language is general, and contains no provision as to the manner of expending the money, except that it shall be for schools.

2. "That the 72 sections of land set apart and reserved for the support of a University are hereby granted and conveyed to the state, to be appropriated solely to the use and support of such University, in such manner as the legislature may prescribe."— *1 Comp. Laws, p. 38.*

The proposition contained in this ordinance was accepted by the State of Michigan. — *Id. p. 42.*

And thereupon the state was admitted into the Union. *1 Comp. Laws, p. 43.*

By the express terms of this grant, the appropriation of these lands to the purpose of the University for its support, was to be made in such manner as the legislature may prescribe.

This is no naked power which exhausted itself upon its execution by an appropriation or disposition of the lands, but it is a trust, which must last forever, and the application and appropriation of the fund must forever remain with the legislature, and be subject to its disposition; and the words "direction and control" in the constitution as applicable to the "expenditures" of the interest fund arising from these lands must be construed by every rule of good faith, and every principle of honesty and fair dealing, as a "direction and control," to be provided by act of the legislature which is the law to the regents, as it is the law of the land.

Under the plain terms of this grant then the funds of the University are placed in the hands of the legisla-

ture as the hand and instrument of the state which is the trustee.

By what authority then is it claimed that the legislature has been deprived of this trust, and the regents have become vested with its powers.

The answer and the only answer is, by one party to the compact creating the trust; by the trustee itself, of its own will, its own volition, upon its own motion, without the concurrence or consent of the source from which the trust flowed.

Such a divesting of a trustee of the powers and duties of an express trust is inconsistent with every principle of fair dealing, and is repugnant to the elementary rules and principles of the law of trusts.

By the acceptance of the proposition contained in this ordinance the state is bound by solemn compact and treaty to maintain the university by the hand and strength, the the power of the legislative department of the state government; and in the light of this ordinance, and so as to accord with and carry out its terms and its meaning, must every provision of the constitution and every section of the laws of the legislature be construed.

The construction for which we contend pursues and is consonant with the terms of the grant.

The constitution provides that the superintendent of public instruction shall have the "*general supervision of public instruction.*"

*That the regents shall have the general supervision of the university,* and the direction and control of its expenditures of the interest fund.

In the nature of things the legislature must perform its duties and execute its powers through some agents, and these agents must have supervision, direction, and control, but not such as places them above or out from under the power of the legislature.

They have created the office of superintendent of public

instruction to supervise the whole system of education, and to him must the regents, as well as the primary school officers, report. Under this general supervision of the superintendent are placed the regents, and they have supervision of the university as he has of the whole system, and also under him are placed the primary school officers to supervise that branch of the grant applying to their schools.

The respective duties and powers of all these officers are to be fixed by the legislature except that the constitution has provided that there shall be a board of regents through whom, for the purpose of electing a president of the university and expending the interest fund, the legislature shall act, and even those provisions are of doubtful validity for want of form in the convention to make them and preserve good faith in the execution of this grant.

4. The construction for which we contend has always been held by the legislature, and under such peculiar circumstances as to give it great weight.

The present constitution was adopted at the general election of 1850. The old constitution was silent as to the university.

The legislature of 1851 assembled almost immediately after the labors of the convention were concluded, and the constitution was adopted by the people.

It was composed largely of the members of the constitutional convention, having at least ten or twelve members who had belonged to that body, and at least two who have been promoted to the bench of the Supreme Court.

That body passed a law to carry into effect the provisions of the constitution upon this subject and for the reorganization and government of the university under that instrument.

This law proceeded to designate the title and declare the objects of the university.

Declared it to be under the government of the regents, and that the regents were the corporation.

So far the law but in effect recites the constitution, and having plainly and carefully rehearsed its provisions it proceeds to declare, define and fix the power of the regents, and provide for the government of the university.—*Laws of 1851, p. 205.*

This law in the plainest terms declares the construction of the constitution for which I contend.

It is still in force and has for eighteen years been acted upon as the charter and fundamental law of the university. — *1 Comp. Laws p. 711.*

In 1855 the Legislature again declared this construction by the passage of the act now in question, and in 1859 they recognized the law of 1851 as binding and of full force by amending its provisions so as to modify the report of the regents to the superintendent, by omitting the journal of their proceedings. — *Laws 1859 p. 768.*

And again in 1867 by cutting off certain supplies to the university until the act of 1855 shall be carried into effect.

5. The regents themselves have given to the constitution the construction for which I contend.

They are to-day acting and carrying on the government of the university under the law of 1851.

They have by solemn resolution yielded their obedience to this law of 1855 and made a pretence of executing it, and have sought the aid of this court for an enforcement of its provisions. — *Regents v. Auditor General, 17 Mich. 161.*

6. Public policy and the welfare and prosperity of the University point to this construction.

To make the Regents independent of the Legislature is to perpetuate a contest, and lay the foundation for strife and jealousy, of which we have but seen the symptoms, and which can result only in disaster to an institution invaluable to the State, and of which we are already justly proud.

The legislature has the exclusive control of the funds upon which the University must always depend.

It controls the sale of the lands and is the taxing power in the State and upon these sources the University must depend for its support. It is fit and proper that the same body which furnishes the fund should have the absolute control of its disbursement, and to so divide it, that the Legislature shall have no voice in its expenditure, is to weaken the interest of the people in the institution and to introduce an element of disaster.

7. The public good requires the enforcement of this law.

The policy which excludes the Homeopathic system of medicine from the University is bigoted and narrow minded.

The system has risen to the dignity of a school which entitles it to respect and to careful attention and study. And it has come to be a main branch of the science of medicine, and as such should have a place in every leading university in the country, and especially in ours.

*C. I. Walker*, for respondents.

The principal question involved in this case is: Has the Legislature the right under the Constitution, to require the Board of Regents to appoint a Professor of Homeopathy, as they have attempted to do by the act of 1855?

The University, as now organized was established under the act of March 18th, 1837, which act was re-enacted by the Revised Statutes of 1838—1846.—*Rev. Statues*, 1837 *p 234: Rev. Statutes, 1846, p. 216.*

Under this act the Legislature undertook to prescribe the number and kinds of professorships in the University, and to prohibit the establishment of any others except by Legislative consent.—§ *8* of those acts.

These acts continued in force until the adoption of the Constitution of 1851.

The Convention that formed that Constitution exhibited, both in their debates and their work, a great distrust of the Legislative power. This is very manifest, in their restrictions upon legislative authority, both trivial and important.

Indeed, this distrust is the most notable characteristic of that Constitution framed by them.

This distrust was especially shown by their action upon the subject of education.

. It is very evident that the Constitutional Convention of 1850 intended to place the entire power over the University in the hands of the Regents, who were elected by, and accountable to the people, and who as much represent the people as the Legislature themselves.

The evil sought to be avoided was the interference with the internal affairs of this great educational institution by. a changing body not familiar with its condition or wants — *Convention Debates pp. 137, 782–4, 802–4.*

This intent, may be clearly inferred from the general character of the Constitution ; in its restriction of legislative power, and from the action of the Convention in relation to this very subject already referred to.

But this is also very clear from the language of the Constitution itself.

" The Board of Regents shall have the general supervision of the University, and the direction and control of all expenditures from the University Interest Fund."—§ *8, Art. XIII.*

They are to have not only the general supervision, but the *exclusive* direction and control of all expenditures, for there is no such thing as *direction* and *control* without its being *exclusive.*

The Legislature of 1851 gave a fair interpretation to

this Article in Section 5 of the act passed relating to the University, and this interpretation was subsequently adopted by the Supreme Court.—*Session Laws, 1851, p. 205-6: The People, etc., vs. The Regents, 4 Mich., 78.*

"The Regents shall have power to enact ordinances, by-laws and regulations for the government of the University; to elect a President, to fix, increase and reduce the regular number of professors and tutors, and to appoint the same; and to determine the amount of their salaries.—*Session Laws, 1851, p. 205-6.*

This supervision, this exclusive direction and control of expenditure, involves, as a necessary incident, and by the clearest implication, this power "to fix, increase and reduce the regular number of professors," and to determine the amount of their salaries."

As to this doctrine of implied powers, see *Cooley Const. Lim. 63-4.*

The amendment to this act of 1851, under which the relators claim that the Board of Regents are bound to appoint a Professor of Homeopathy, is, we insist, clearly unconstitutional, as an attempt upon the part of the Legislature to exercise the power exclusively conferred upon the Regents.—*1 Comp. Laws, 2187.*

If the Legislature can require the appointment of one professor, they can of another or any number of others. And if they can say what professorships shall exist, they can say what shall not, and who shall fill Professors' Chairs. And if they can regulate the internal affairs of the University in this regard, they can as to all others, and thus the supervision, direction and control provided for by the Constitution in the Board of Regents is at an end.

Professors are not expected to serve without salaries, and if the Legislature can regulate the number and kinds of professors, they can indirectly direct and control as to expenditures.

Either the Legislature has no power of this sort, or that

power has no practical limit, and the old state of things is restored. The legislature is supreme, and the Regents are their servants, bound to carry out their edicts, instead of being the representatives and servants of the people who elected them.

We insist that they have no such power under the Constitution.

The question is one of vital moment to the interests of the University, and we ask for it that careful consideration which its importance demands.

This tendency to legislative usurpation, foreseen and foretold by the fathers, and so natural and inevitable in a system like ours, needs to be held in check by constitutional provisions, interpreted and enforced by the judicial department of the government—a department co-ordinate with, but not subordinate to, the Legislature; a department that as truly represents the sovereignty of the people as any other in the government.—*Federalist*, *No. XLVII: Id. No. LXX.*

GRAVES J.

The Attorney General having applied for a mandamus to require the regents to appoint a professor of Homeopathy in the department of medicine in the University, pursuant to section 2,187 of the compiled laws, and the usual order for showing cause against the motion having been made, the Regents at the last January term made answer to the order, and alleged for cause against the application, that the part of the section referred to which provided there should always be at least one professor of Homeopathy in the department of medicine, was repugnant to the provisions of Article 13 of the Constitution, which confers upon the Regents the power of general supervision of the University. The question thus presented was ably argued by counsel, and we have considered it with an·

earnest desire to reach a decisive result. But in this we are disappointed by an equal division of opinion among the members of the court. As this circumstance would deprive our opinion of all force as judicial authority, we do not deem it expedient to superadd our reasonings to the elaborate arguments from the bar. It is seen that since the application cannot obtain the sanction of a majority of the court the motion must fail.

The other Justices concurred.