REGENTS OF THE UNIVERSITY OF MICHIGAN v STATE OF MICHIGAN

1. APPEAL AND ERROR—MOOT QUESTION—PUBLIC SIGNIFICANCE.

A question of public significance which is likely to recur does not become moot by a change in position of the parties through the passage of time; constitutional questions concerning the effectiveness of attempted legislative interference with the internal affairs of state universities are of sufficient importance to warrant a decision by the Court of Appeals.

2. APPEAL AND ERROR—MOOT QUESTION—LEGISLATIVE INTENT—CONSTITUTIONAL LAW.

The question of the constitutionality of sections of a statute has not become moot and cannot be waived by the parties on appeal because of the omission of those sections from a later modified statute where a reading of the new statute discloses that the Legislature has merely switched its tactics from asserting direct control to asserting indirect control of the constitutionally created boards of control of the state universities and has switched to a more indirect approach designed to achieve the same end; the issue is alive and must be judicially determined (1971 PA 122, 1972 PA 260).

3. CONSTITUTIONAL LAW—UNIVERSITIES—INSTITUTIONAL FUNDS—LEGISLATIVE CONTROL.

The power to control and direct the expenditure of institutional funds is clearly vested by the Constitution in the boards of regents, governors, or trustees of state universities and any attempt by the Legislature to control the internal operations of universities by dictating how funds appropriated may be spent by the governing boards is beyond the power of the Legislature (Const 1963, art 8, § 5).

4. CONSTITUTIONAL LAW—UNIVERSITIES—INTERNAL OPERATION—LEGISLATIVE CONTROL.

The right to determine the number of out-of-state student enroll-

---

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 5 Am Jur 2d, Appeal and Error § 760.
[3–8] 55 Am Jur Universities and Colleges §§ 25–30.
 15 Am Jur 2d, Colleges and Universities §§ 30, 31.

ments, to set fees to be charged such students, and to prescribe the minimum number of hours to be taught by the faculty relates to the supervision of the internal operations of universities and are within the exclusive authority of the governing boards of the institutions; a statute requiring the governing boards to abdicate their constitutional right and duty to supervise their respective institutions is unconstitutional (Const, 1963, art 8, § 5).

5. CONSTITUTIONAL LAW—UNIVERSITIES—TUITION—LEGISLATIVE CONTROL.

The power to establish tuition and student fees reposes exclusively in the governing boards of state universities and it is beyond the power of the Legislature to attempt to establish tuition rates by a statute which provided that the general appropriation will automatically be reduced by an amount equal to any monies received by the universities as a result of an increase in student fees or tuition, which would indirectly prevent the universities from increasing their tuition rates.

6. COLLEGES AND UNIVERSITIES—APPROPRIATIONS—VESTING—INSTALLMENT PLAN.

A legislative appropriation for a state university vests in the recipient when made and is not subject to subsequent diminution by the Legislature even though disbursed on the "installment plan".

7. CONSTITUTIONAL LAW—UNIVERSITIES—TUITION—LEGISLATIVE CONTROL—APPROPRIATIONS.

An appropriation statute which provided that state universities could not decrease their tuition rates below the figures used in computing the appropriation and could not increase their revenues by raising tuition subsequent to the appropriation is an unconstitutional infringement of the exclusive authority of state universities to establish tuition rates.

8. CONSTITUTIONAL LAW—UNIVERSITIES—CONTROL—STATE BOARD OF EDUCATION.

The power of the boards of control of institutions of higher education is not limited by the powers vested in the State Board of Education to serve as a general planning and coordinating body for all public education and to advise the Legislature as to the financial requirements in connection therewith; authority over the governing boards of the state universities was not granted the Michigan State Board of Education by the Constitution (Const 1963, art 8, §§ 3, 5).

Appeal from Ingham, Marvin J. Salmon, J. Submitted Division 2 November 8, 1972, at Lansing. (Docket No. 13422.) Decided May 16, 1973. Leave to appeal granted, 390 Mich 768.

Complaint by the Regents of the University of Michigan, the Board of Trustees of Michigan State University, and the Board of Governors of Wayne State University against the State of Michigan, the Treasurer, the Comptroller of the Department of Administration, and the Budget Director for a judicial determination that certain appropriation statutes impinged on the plaintiffs' authority. The State Board of Education intervened as defendant by leave granted. Judgment for plaintiffs. Defendants appeal. Affirmed.

*Miller, Canfield, Paddock & Stone* (by *George E. Bushnell, Jr.) (Roderick K. Daane,* for the University of Michigan; *Leland W. Carr, Jr.,* for Michigan State University; and *Richard Strichartz,* for Wayne State University, of counsel) for plaintiffs.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Eugene Krasicky, Gerald F. Young, William G. Jackson,* and *Patrick Kowaleski,* Assistants Attorney General, for defendants.

Before: McGREGOR, P. J., and BRONSON and TARGONSKI,* JJ.

McGREGOR, P. J. Defendants appeal as of right from the trial court's determination that certain sections of 1971 PA 122 are unconstitutional as applied to plaintiffs, and the intervening defendant appeals from that portion of the lower court's

---

* Former circuit judge, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

judgment which held that intervening defendant possessed no power to require its prior approval of certain education programs proposed by plaintiffs before plaintiffs could validly implement said programs.

This appeal results from a three-way struggle on the part of several governmental titans—the major universities, the State Legislature, and the State Board of Education—for the power effectively to control and direct the future course of higher education within this state. On December 22, 1967, plaintiffs filed a complaint requesting a judicial determination that certain statutes unconstitutionally impinged upon plaintiffs' authority as granted by Const 1963, art 8, § 5. After the elapse of a lengthy time interval, during which plaintiffs amended their original complaint several times in order to keep pace with legislative alterations of and additions to the statutes being attacked, the Michigan State Board of Education, on December 18, 1970, was granted leave to intervene in the case. All parties subsequently moved for summary judgment, and the trial court then heard oral arguments on this motion.

On December 6, 1971, the trial court filed a comprehensive written opinion declaring *inter alia* that §§ 13, 16, 18, 19, 20 and 26 of 1971 PA 122 were unconstitutional, that §§ 1, 4, 7, 8 and 14 of said act were constitutional, and further that the intervening defendant did not have constitutional authority to require its prior approval of certain educational programs proposed by plaintiffs as a prerequisite to plaintiffs' valid implementation of said programs. On January 6, 1972, a judgment was entered pursuant to the trial court's written opinion. The State of Michigan, Allison Green, its Treasurer, and Glenn S. Allen, Jr., its Comptroller, (hereinafter referred to as defendants), on

January 24, 1972, appealed as of right from the lower court's ruling that certain sections of 1971 PA 122 were unconstitutional. The Michigan State Board of Education (hereinafter referred to as the intervening defendant) on that same date appealed as of right from that portion of the trial judge's decision which held that said intervening defendant could not require its prior approval of certain educational programs which plaintiffs wished to implement.

## I.

Subsequent to the commencement of this appeal, defendants filed a supplemental brief urging that §§ 16, 18, 19 and 26 of 1971 PA 122 are not at issue in this appeal because of their omission from 1972 PA 260. Defendants claim that the question of the constitutionality of those sections is moot and they now "waive" their appeal as to those sections.

We are not inclined to dismiss these questions on the basis of their alleged mootness.

The courts of this state have long recognized that an appeal does not become moot, despite the change in position of the parties through the passage of time, when the issue is of public significance and is likely to recur. In *Milford v People's Community Hospital Authority,* 380 Mich 49, 55 (1968), the Court held:

"We deal first with the subject of mootness. Plaintiff in his supplemental complaint alleges that he was removed from the staff of Beyer Memorial Hospital pursuant to section 4.12 of the staff by-laws, which provides for annual reappointment. One might argue that as plaintiff is no longer a member of the staff, the question of his reduction of privileges is moot. Appel-

lant and appellees each request us to decide the question, since, as they say, the matter is of great importance not only to the hospital and doctor involved but to all the doctors and publicly owned and operated hospitals in the State.

"The nature of this case is such that we are unlikely to again receive the question in the near future, and doctors and other people dealing with public hospital corporations cannot hope to have an answer to the questions raised unless we proceed to a decision. For these reasons, we conclude the case is of sufficient importance to warrant our decision."

In *Dartland ex rel De Motts v Hancock Schools,* 25 Mich App 14, 16 (1970), this Court held:

"We hold the question raised is not moot for two reasons: First, the term for which appellant was a candidate was for four years. The office is still being filled by a candidate chosen at the election which appellant claims was legally infirm. Thus, were the allegations of illegality to be sustained, there would remain some period of time when another selectee could serve for the remainder of the term. Secondly, under our holding in *Robson v Grand Trunk Western Railroad Company* (1966), 5 Mich App 90, if the question presented is of importance to the jurisdiction of the state, we are empowered to pass upon it judicially even though in a technical sense the question as to the involved parties or subject matter may be moot."

In *Lafayette Dramatic Productions v Ferentz,* 305 Mich 193, 218 (1943), the same rule was expressed:

"During the pendency of this appeal defendants filed motion in this court to dismiss the appeal, alleging that the contract for the employment of musicians for the period of one year had been fully performed and that the questions involved had, therefore, become moot. In such motion defendants further alleged in substance that the parties had entered into a new contract that

was being amicably fulfilled. Plaintiff filed answer to such motion, denying that the questions regarding the validity of the contract have become moot and in substance alleging that plaintiff has been forced by duress and coercion to continue the contract in question for a further period of time.

"We have before us on this appeal only the questions relating to the original or first contract for one year. Notwithstanding such questions and the issues presented by this record might be considered moot, we deem the case of sufficient importance to warrant our decision, even though it may be in the nature of a declaratory decree."

In *Robson v Grand Trunk Western Railroad Co*, 5 Mich App 90, 99 (1966), this Court decided a question regarding the constitutionality of the manner of selecting jurors even though the challenged jury had completed its term, because

"it is apparent that the errors complained of in the selection of the jury in the instant case have occurred in prior jury selections and may continue in the future."

It is clear that the issue raised by this appeal is of fundamental importance to the people of this state. It is equally clear that the Legislature's attempted assertion of power over the operation of the three major state universities and the resistance of those attempts by the constitutional boards of control is an ongoing, recurring dispute which cannot be confined to the language of a single year's appropriation act.

As this case involves constitutional questions of critical importance concerning the effectiveness of attempted legislative interference into the internal affairs of the state universities, we deem those questions to be of sufficient importance to warrant our decision thereon.

Furthermore, a careful reading of 1972 PA 260 discloses that the Legislature has in no way abandoned its intention to substitute its judgment for that of the constitutionally created boards of control. Sections 16 and 18 of 1971 PA 122 prohibited the expenditure of state funds for instructors or students who had been found guilty, either by the courts or school officials, of interfering with university operations or damaging university property. The attorney general sought to defend those sections by invoking the "police power" even though their ultimate effect would be to require the firing of an instructor or expulsion of a student, matters which relate to the internal operation of the university rather than the public welfare. Now, the Legislature, having lost the argument below, has changed tactics without changing its purpose.

Section 9 of 1972 PA 260 provides:

"In order that the legislature obtain relevant information concerning the possible need for legislative exercise of the police power with respect to the colleges and universities of this state, all institutions of higher learning shall submit a full report of any incidents that result from any physical violence or the destruction of property including the total damages in dollars incurred. The report shall include the number of students arrested and classes missed due to strikes, boycotts or demonstrations. This report is due within 30 days of the incident."

Section 11 provides:

"Any student who received scholarship funds under the provisions of Act No. 208 of the Public Acts of 1964, as amended, being sections 390.971 to 390.980 of the Compiled Laws of 1948, or receiving tuition grants under the provisions of Act No. 313 of the Public Acts of 1966, as amended, being sections 390.991 to 390.997a

of the Compiled Laws of 1948, for or while in attendance at an institution of higher education, which received appropriations under this act, and is either convicted in a court of law of the violation of any penal statute or ordinance prohibiting disorderly conduct, violence to a person or damage to property, which violation is committed while participating in any disorder, disruption of the administration of or the rendering of services, or giving of instruction at any such institution, by the proper authorities of such institutions of violating its rules while so participating shall forfeit any right or qualification which he may otherwise have for the receipt of further benefits under either or both of said acts. Upon final conviction of any such student of any penal violation or determination of violations of such rules the president of such institution of learning shall cause report of the same to be forwarded forthwith to the awarding authority under said acts, which authority shall forthwith terminate any such assistance provided under either or both of said acts to such students. Any rule of any such institution relied upon to determine continued eligibility for said scholarship shall be in accord with due process of law including the right of appeal."

And § 12 provides:

"No part of any appropriation made under this act may be used for the payment of any salaries, wages or fees to any trustees, administrators, faculty member or other employee or for the education of a student, either full or part time, who shall possess or permit to be possessed, without being a peace officer employed by an institution of higher education, any firearm not registered with the institution or other dangerous weapon in any university, college or institution of higher education including all the buildings and grounds under their jurisdiction."

Whether it be under the guise of the police power or a reporting requirement, the simple fact remains that the legislature still is attempting

through 1972 PA 260 to do the same thing it sought to do through 1971 PA 122 and prior acts: *i.e.,* determine who shall teach and who shall not, who shall learn and who shall not.

Section 19, Public Act 122 sought to impose minimum teaching hours on each faculty member at the universities. The trial court held that section to be an unconstitutional interference with the autonomy of the plaintiffs, and the Legislature responded to that decision by enacting § 16, Public Act 260:

"The colleges and universities shall submit an annual academic staff performance audit. This audit shall be submitted to the legislature and the executive office by February 1, 1973. The academic staff performance audit shall include measures of experience, training, salary and other compensation, rank and productivity in terms of instruction and other duties of all academic staff."

Furthermore, § 4(3) of Public Act 260 provides, in part:

"Annually the legislature shall evaluate faculty workloads and faculty instructional productivity of each institution according to the guidelines set forth in section 19 of Act No. 122 of the Public Acts of 1971 in the process of assessing the financial needs of each institution for ensuing years."

The language is different, but the purpose and effect are the same—legislative control over the educational process. The threat of economic sanctions for failing to meet the standards of § 19 of Public Act 122 still exists. Although the Legislature has switched its tactics from asserting direct control to asserting indirect control, the issue is alive and must be judicially determined.

Finally, the Attorney General contends that the appeal from the holding that § 26, Public Act 122

is unconstitutional is now moot. That section sought, indirectly, "to institute * * * a structure of student fees" by shrinking the appropriation in the event that the university changed its tuition rates. Again, the Legislature has switched to a more indirect approach designed to achieve the same result. Section 1, Public Act 260 allocates a specified amount to each of the state-supported colleges and universities.

The import of this section is that the Legislature formally recognizes that the total budget of the university is a certain amount, that the total institutional revenues, including specified amounts from in-state tuition and out-of-state tuition, are a specified amount, and that "in recognition of" those amounts, certain specified amounts are appropriated for specified purposes. Although there is no question as to the propriety of the Legislature reviewing the budgets and sources of revenue of the universities as a part of its allocation process, the inclusion of itemized revenue sources and the listing of the amount of state funds which can be used for each program of the university in an appropriations act could be construed as an attempt to dictate not only the amount of tuition charged, but also how much each university may spend on each of its various colleges, schools, and programs.

Again, this dispute has not ended and this question must be decided by this Court.

## II.

Having determined that this matter is ripe for judicial determination, the first substantive issue is whether the trial court erred in ruling that certain sections of 1971 PA 122 unconstitutionally

impinged upon the authority granted to plaintiffs by Const 1963, art 8, § 5.

It should be noted preliminarily that the intervening defendant is not involved in that portion of the current dispute discussed under issue I. By the same token, issue II involves only the plaintiffs and the intervening defendant; the other defendants are not participants in that portion of the instant appeal discussed under issue II.

Of particular relevance in this case is Const 1963, art 8, § 4, which provides as follows:

"Sec. 4. The legislature shall appropriate moneys to maintain the University of Michigan, Michigan State University, Wayne State University, Eastern Michigan University, Michigan College of Science and Technology, Central Michigan University, Northern Michigan University, Western Michigan University, Ferris Institute, Grand Valley State College, by whatever names such institutions may hereafter be known, and other institutions of higher education established by law. The legislature shall be given an annual accounting of all income and expenditures by each of these educational institutions. Formal sessions of governing boards of such institutions shall be open to the public."

Also germane to the instant case is Const 1963, art 8, § 5, which states in pertinent part:

"Sec. 5. The regents of the University of Michigan and their successors in office shall constitute a body corporate known as the Regents of the University of Michigan; the trustees of Michigan State University and their successors in office shall constitute a body corporate known as the Board of Trustees of Michigan State University; the governors of Wayne State University and their successors in office shall constitute a body corporate known as the Board of Governors of Wayne State University. *Each board shall have general supervision of its institution and the control and direction of*

*all expenditures from the institution's funds."* (Emphasis added.)

The emphasized portion of the last-quoted excerpt constitutes the crux of the present dispute, which in its simplest terms involves a struggle between plaintiffs and the Legislature, regarding the extent to which the Legislature may place controls upon the spending of its appropriations to plaintiffs.

The nature and extent of proper legislative conditions upon the spending of appropriations made to the governing boards of plaintiff universities has long been a delicate problem which has engendered a considerable amount of litigation over the years in this jurisdiction. At issue is, of course, nothing less than the reconciling of the Legislature's recognized general prerogative to raise and to spend tax monies, with the equally important prerogative of the governing boards of plaintiff universities to control and direct the expenditure of funds appropriated to them by the Legislature. The complex question of defining the proper limits of the Legislature's power to condition the spending by university governing entities of appropriations made to the universities by the Legislature has been well stated in 55 Mich L Rev 728, 729–730 (1957) as follows:

"While it must be recognized that the legislature's power to make appropriations to a constitutional university does not include and is separate from the power to control the affairs of such a university, the legislature can within reason attach conditions to its university appropriations. If a constitutional university accepts such conditioned funds, it is then bound by the conditions. There are not many decisions in this area, however, so the line between conditions the legislature can validly attach and those it cannot has not been drawn in a distinct fashion. Conditions which require the university to follow prescribed business and ac-

counting procedures have generally been found to be valid. The courts have also sustained conditions which require, on penalty of losing part of the appropriation, annual reports to the governor, and fair and equitable distribution of an appropriation among the departments of the university or maintenance of university departments. It has also been held that the legislature can properly make non-teaching employees subject to the state's workmen's compensation law, and can require loyalty oaths by the teachers. On the other side of the line, a condition that the university move a certain department of the school has been held to be invalidly attached, and an attempt to limit the amount of the funds that can be spent for a given department is likewise an invalid condition. It is clear that limits should be placed on the use of the conditioned appropriation, for without such limits the legislature could use the conditioned appropriation to strip the university of its constitutional authority."

In *Weinberg v Regents of the University of Michigan,* 97 Mich 246, 254 (1893), the Michigan Supreme Court stated:

"Under the Constitution, the State cannot control the action of the Regents. It cannot add to or take away from its property without the consent of the Regents. *In making appropriations for its support, the Legislature may attach any conditions it may deem expedient and wise, and the Regents cannot receive the appropriation without complying with the conditions.* This has been done in several instances.

" * * * So, *when the State appropriates money to the University it passes to the Regents, and becomes the property of the University, to be expended under the exclusive direction of the Regents, and passes beyond the control of the State through its legislative department."* (Emphasis added.)

See also *Board of Regents of the University of Michigan v Auditor General,* 167 Mich 444 (1911).

The holding in *Weinberg, supra,* is qualified in

*State Board of Agriculture v Auditor General,* 226 Mich 417 (1924), wherein the relevant statute had appropriated certain monies exclusively for use in cooperative agricultural extension work and stated:

"Each of said amounts shall be used solely for the specific purposes herein stated, subject to the general supervisory control of the State administrative board."

After noting the apparent conflict between the last-quoted sentence and the constitutional provision that the college board was to have general supervision of the college as well as direction and control of all agricultural college funds, 226 Mich 417, 421, the Court's majority characterized the dispute as follows:

"As viewed by the plaintiff, the question involved is whether the State board of agriculture shall continue to exclusively manage the affairs of the college as provided by the Constitution, or surrender its rights to the State administrative board. As it appears to the defendant, the question is whether it may not exercise general supervisory control over funds received by the college by way of appropriations from the legislature without invading the constitutional rights of the State board of agriculture." 226 Mich 417, 423.

In a portion of the opinion particularly relevant to the issue at bar, the Court then adverted to the *Weinberg* decision, *supra,* and declared:

"There is, however, a distinction between funds received by way of appropriations and other college funds. The appropriation may be upon condition that the money shall be used for a specific purpose, *or upon any other condition that the legislature can lawfully impose.* The language used in some previous decisions of this court in reference to this question seems to have been misunderstood. For instance, the following:

" 'In making appropriations for its support, the legislature may attach any conditions it may deem expedient and wise, and the regents cannot receive the appropriation without complying with the conditions.' *Weinberg v Regents of University,* 97 Mich 246, 254.

"Clearly, in saying that the legislature can attach to an appropriation any condition which it may deem expedient and wise, *the court had in mind only such a condition as the legislature had power to make. It did not mean that a condition could be imposed that would be an invasion of the constitutional rights and powers of the governing board of the college. It did not mean to say that, in order to avail itself of the money appropriated, the State board of agriculture must turn over to the legislature management and control of the college, or of any of its activities.* This logically leads us to a consideration of the character of the condition attached to the appropriation involved in the instant case. Is it a condition that the legislature had power to make?" 226 Mich 417, 424–425. (Emphasis added.)

After quite properly striking that portion of the statute which purported to grant defendant general supervisory control over plaintiff's expenditures, the Court concluded:

"It follows that the State board of agriculture is entitled to the appropriation subject to the condition that it shall be used for the purpose specified. It is the undoubted right of the administrative board to see that the condition is complied with. We understand that the plaintiff is willing to accept the appropriation on these terms. If so, the money should be paid.

"It has been suggested that only by following the fund into the hands of the board of agriculture can the administrative board compel a compliance with the condition as to the manner of its expenditure. As we have pointed out, *when the money appropriated passes into the hands of the State board of agriculture, it becomes college property, and is thereafter under the exclusive control of that board, but must be used for the*

*purpose for which it was granted."* 226 Mich 417, 428–429. (Emphasis added.)

The *State Board of Agriculture v Auditor General, supra,* decision was relied upon by the attorney general in rendering opinions as to the constitutionality of legislative acts. In 1 OAG, 1955, No. 2127, p 262 (May 11, 1955), the attorney general was called upon to render an opinion as the constitutionality of senate bill No. 1432 which appropriated monies for various state institutions and conditioned the appropriation to Michigan State College by stating that sums appropriated to that institution could not be used to obtain a VHF television station, and which further forbade any university from letting a contract for construction of a self-liquidating project without prior legislative approval. While the attorney general's opinion recognized that "the legislature has the power in making appropriations to attach certain conditions thereto," the opinion then proceeded to rely heavily upon *Board of Agriculture, supra,* as authority for its assertion that both the prohibition against a VHF license at Michigan State College and the requirement that contracts for self-liquidating projects be previously approved by the Legislature were invalid as unconstitutional invasions by the Legislature upon the autonomy of the schools' governing bodies.

The Attorney General was asked to rule upon the constitutionality of 1962 PA 232, § 16, which provided a general appropriation to the Board of Trustees of Michigan State University, conditioned by § 16 of said act, as follows:

"Recognizing the board of trustees of Michigan state university of agriculture and applied science as having general supervision of Michigan state university and the direction and control of its funds; nevertheless, as a

condition of appropriating funds to the university under this act, no portion of such appropriation shall be used to maintain or continue the industries and labor relations center or any center or school of a similar nature."

Citing 1 OAG, 1955, No. 2127, p 262 (May 11, 1955), *supra,* and relying heavily upon *Board of Agriculture, supra,* the Attorney General concluded, in OAG, 1961–1962, No. 4090, pp 594, 596 (November 15, 1962):

"Simply stated, the provisions of Act 232, PA 1962, as they relate to Michigan State University, demand that the Board of Trustees of the university abdicate its constitutional authority to manage and control the university in return for the appropriation. While it is true that the condition relates only to the industries and labor relations center or any center or school of a similar nature, if the limitations contained in Sec. 16 are valid, the legislature could impose other conditions of a similar nature and thus wrest exclusive control and sole management of all of the funds of the university from its constitutionally designated governing body. Under the authority of *State Board of Agriculture v Auditor General,* 226 Mich 417, the condition imposed by Sec. 16 of Act 232, PA 1962 is unconstitutional and void in that it violates Article XI, Sec. 8 of the Michigan Constitution."

In 1 OAG, 1965–1966, No. 4420, p 61 (April 15, 1965), the Attorney General once more treated the area of conditioned appropriations to institutions of higher education. At issue there was 1964 PA 259, § 13, which provided:

"In view of the fact that state appropriations have been used for certain expenses in connection with self-liquidating projects, no contract shall be let for construction as to any self-liquidating project at any of the state supported institutions of higher education without prior approval therefor by the legislature."

After noting that a comparable provision had been declared unconstitutional in 1 OAG 1955, No. 2127, p 262 (May 11, 1955) *supra,* the Attorney General stated:

"In a letter dated March 10, 1959, addressed to the attorney for the State Board of Agriculture, the Attorney General found Sec. 11 of Act 224, P.A. 1958 to violate Article XI, Sec. 8 of the Michigan Constitution of 1908. The statutory language in Sec. 11 of Act 224, P.A. 1958 is exactly the same as found in Sec. 13, Act 259, P.A. 1964.
"The ruling of the Attorney General in Opinion No. 2127, supra, is controlling of the question you ask. The legislature cannot require the Regents of the University of Michigan to obtain its prior approval before it lets contracts for the construction of any self-liquidating project. Such restriction violates Article VIII, Sec. 5 of the Michigan Constitution of 1963."

These opinions of the Attorney General indicate that *Board of Agriculture, supra,* has been interpreted as greatly restricting the permissible scope of legislative conditions vis-a-vis university appropriations.

In *Jackson Broadcasting & Television Corporation v State Board of Agriculture,* 360 Mich 481 (1960), 1958 PA 224, § 11, and the discussion by the Attorney General in the above quotation from OAG 1965–1966, No. 4420, p 61 (April 15, 1965) was subjected to judicial scrutiny:

"(1) No facts are alleged in the bill from which a conclusion may be drawn or a finding may be made that the project in question is self-liquidating, as in the statute mentioned. That appellation appears in the bill as plaintiff's legal conclusion, without supporting averments. If its conclusion were to be accepted as correct, there are no allegations in the bill that moneys appropriated by Act No. 224 on the supposed condition contained in its section 11 are to be expended on this

project, warranting enjoining thereof. If section 11 of that act were to be construed as a general prohibition against the board of trustees of Michigan State University, without regard to the source of the funds to be used or involved, it would exceed legislative authority. Michigan Constitution of 1908, art 11, § 8. *State Board of Agriculture v Auditor General,* 180 Mich 349; *State Board of Agriculture v Auditor General,* 226 Mich 417; *Weinberg v Regents of University,* 97 Mich 246." 360 Mich 481, 497–498.

It is with this background that we examine the various sections of 1971 PA 122 which were declared unconstitutional by the trial court:

A. Sections 16, 18 and 20, all of which were ruled invalid by the court, provide as follows:

"Sec. 16. No part of any appropriation made by this act may be used for the payment of any salary or wages to any faculty member or other employee or for the education of students convicted of the offense of interference with normal operations of any public institution of higher education as described in Act No. 26 of the Public Acts of 1970, being sections 752.581 to 752.583 of the Compiled Laws of 1948.

"Sec. 18. It is a condition of this appropriation that the net general fund subsidy appropriated herein to each institution of higher education may not be used to pay the cost of instruction for any student who wilfully damages university property as determined either by university officials or by the courts.

"Sec. 20. It is a condition of this appropriation that none of the appropriations contained in this act shall be used for the construction of buildings or operation of institutions of higher education not expressly authorized in section 1. No contract shall be let for construction of any self-liquidating project at any of the state supported institutions of higher education without first submitting to the appropriate legislative committees, schedules for the liquidation of the debt for the construction and operation of such project. Funds appropriated herein to each institution of higher education may

not be used to pay for the construction, maintenance or operation of any self-liquidating projects."

A careful reading of the above sections reveals that the Legislature is attempting to control the internal operations of universities by dictating how the funds appropriated may be spent by the board of regents, governors, or trustees, as the case may be. Such control is clearly beyond the power of the Legislature. Const. 1963, art 8, § 5 clearly vests the power to control and direct the expenditure of their institutional funds.

"Each board shall have general supervision of its institution and the control and direction of all expenditures from the institution's funds."

In *Sterling v Regents of University of Michigan,* 110 Mich 369, 381 (1896), the Court stated that the Constitution gave the regents the power to direct and control all expenditures of university funds. They then held further:

"The power therein conferred would be without force or effect if the legislature could control these expenditures by dictating what departments of learning the regents shall establish, and in what places they shall be located. *Neither does it need any argument to show that the power contended for would take away from the regents the control and direction of the expenditures from the fund. The power to control these expenditures cannot be exercised directly or indirectly by the legislature. It is vested in the board of regents in absolute and unqualified terms."* (Emphasis added.)

*People v Regents of University of Michigan,* 4 Mich 98 (1856); *Weinberg v Regents, supra; Regents of University of Michigan v Auditor General,* 167 Mich 444 (1911); see also *Bauer v State Board of Agriculture,* 164 Mich 415 (1911).

Again, in *State Board of Agriculture v Auditor General,* 226 Mich 417, 424 (1924), the Court emphatically held that

" * * * the Constitution gave the regents the *absolute management* of the University, and the *exclusive control* of all funds received for its use." (Emphasis added.)

The trial court was corrected in ruling that §§ 16, 18 and 20 are invalid.

B. Sections 13 and 19 of 1971 PA 122, both of which were ruled invalid by the trial court, provide as follows:

"Sec. 13. It is a condition of this appropriation that no college or university having an enrollment of out of state students in excess of 20% of their total enrollment shall increase their enrollment of out of state students in either actual number or percentage over the actual numbers and percentages that were enrolled in the 1970–71 school year.

"Further it is the intent of the legislature that an out of state student shall pay a student fee equal to approximately 75% of the cost of instruction at the respective institution of higher education."

"Sec. 19. It is a condition of appropriation that each full time faculty member who is paid wholly from the line item instruction will teach as a part of his regular load a minimum of not less than 12 credit hours or 360 student credit hours or a combination of 18 credit or laboratory contact hours at developing colleges and universities, regional colleges and universities, and an average of 10 credit hours or 300 student credit hours or a combination of 15 credit or laboratory contact hours at graduate institutions. The above calculations on a semester basis will apply to institutions on a quarter or trimester basis equivalently. Any such faculty member who is paid partly from state funds appropriated herein and partly from funds derived from other sources shall teach a number of classroom hours

in proporation to the salary paid from state funds appropriated herein."

In discussing § 13, defendants readily admit that plaintiffs "possess the constitutional authority to determine both how many out-of-state students will be enrolled and the tuition or student fee rates for such students at their respective institutions."

In rejecting both §§ 13 and 19 as unconstitutional, the trial court stated:

"The right to determine the number of out-of-state student enrollments, to set the fees to be charged such students, and to prescribe the minimum number of classroom hours to be taught by the faculty are matters solely within the exclusive authority of the plaintiffs. It cannot seriously be contended that such matters do not relate to the general supervision of the internal operations of plaintiffs' respective institutions, and the state-defendant admits as much in its brief * * * . By attaching these conditions the legislature is requiring plaintiffs to abdicate their constitutional right and duty to supervise their respective institutions. This court, therefore, declares sections 13 and 19 of 1971 PA 122 to be unconstitutional under Const 1963, art 8, § 5."

In *Board of Agriculture v Auditor General, supra,* p 425, the Court held:

" * * * in order to avail itself of the money appropriated,"

it is not necessary that the governing board of a university

" * * * turn over to the legislature management and control of the college, or of any of its activities".

The clear intent of §§ 13 and 19, 1971 PA 122 was to assert control over the internal manage-

ment of the affairs of the university. As such, the trial court correctly held that those sections were invalid under Const 1963, art 8, § 5.

C. Section 26, also invalidated by the trial court, reads as follows:

"Sec. 26. If revenue from tuition and student fees excluding self-liquidating or activity fees exceeds in the aggregate the amount reported by the institutions of higher education in their notification of April 15, 1971 for Michigan resident students as a result of an increase in student fees or tuition the general fund subsidy appropriated for the support of that branch or institution of higher education shall automatically be reduced by the amount by which such revenue exceeds the amount reported. Each institution of higher education shall certify to the legislature not later than April 15, 1972 the schedule of tuition and student fees applicable to Michigan resident students for the fiscal year 1972–73.

"In computing student fees the revenue figures were derived according to the following schedule:

| Rate Per Semester Hour | | Rate Per Quarter Hour | | Institution |
|---|---|---|---|---|
| Under-Graduate | Graduate | Under-Graduate | Graduate | Graduate |
| $21.00 | $28.00 | $14.00 | $18.66 | Michigan State University University of Michigan Wayne State University" |

The crucial problem which must be resolved in analyzing § 26 is whether or not said section constitutes a de facto attempt by the Legislature to establish tuition rates at plaintiff universities. All parties to this action explicitly concede that the power to establish tuition rates reposes exclusively in plaintiffs and not in the Legislature. Defendants admit in their brief that "it must first be recognized that [plaintiffs] herein, not the Legislature, possess the constitutional authority to establish tuition rates."

The trial judge discussed paragraph 1 of § 26 as follows:

"Section 26 provides that the general appropriation will 'automatically be reduced' by an amount equal to any monies received by plaintiffs as a result of an increase in student fees or tuition above that reported on April 15, 1971. The effect of such a provision is to prohibit the plaintiffs from increasing their revenues by increasing tuition rates and student fees, because any increase by the plaintiffs will automatically result in an equal decrease in funds already appropriated."

The lower court then concluded:

"Since the legislature could not directly prohibit plaintiffs from increasing their tuition rates or student fees, it cannot do so indirectly by deducting any increases from the funds appropriated to the plaintiffs. Further, as was previously stated, once the legislature makes a general appropriation to plaintiffs it becomes the property of the plaintiffs and passes beyond the control of the legislature.

"The court, therefore, holds that portion of section 26 which automatically reduces the appropriations to be unconstitutional in violation of Const 1963, art 8, § 5."

Defendants point out that the monies appropriated by 1971 PA 122 are to be disbursed by warrants issued from the State Treasury in 12 monthly installments. Defendants then aver that since the appropriated funds are to be disbursed on the "installment plan" the power over said funds has not passed out of the control of the Legislature prior to the time that the monies are actually distributed by the State Treasurer; hence, according to defendants, the appropriated funds are validly subject to legislative diminution via paragraph 1 of § 26, should plaintiffs subsequently increase their student fees or tuition rates.

However, defendants' contention is without merit. The appropriation vésts in the recipient when made and thus precludes subsequent diminution by the Legislature. *Weinberg v Regents of the Univ of Mich, supra,* p 254.

Quite aside from the question as to when an appropriation vests in its recipient, paragraph 1 of § 26 appears to be so inextricably bound up with the second paragraph of § 26 and thus so contributes to the de facto legislative establishment of tuition fees at plaintiff universities that it seems invalid on this basis alone. The net effect of § 26 cannot be properly understood apart from an understanding of the interplay between paragraphs 1 and 2 of said section. As previously stated, paragraph 1 establishes an effective maximum tuition rate by providing that any tuition increase subsequent to the date of the appropriation simply decreases said appropriation by an amount equivalent to the net revenue resulting from the tuition increase. Paragraph 2 on the other hand, establishes an effective minimum tuition rate of $21.00 per undergraduate semester hour at plaintiff universities. The operation of paragraph 2 was lucidly explained by the trial judge in his written opinion as follows:

"Section 26 further establishes a schedule of student fees which was utilized by the legislature for the fiscal year 1971–72 in deriving the revenue figures of plaintiffs' institutions. The plaintiffs contend that this provision requires the universities to establish student fees in accordance with the amounts shown in the schedule. The State-defendant, upon the affidavit of the Director of the Bureau of Programs and Budget, contends that the section does not purport to establish the student fee rates to be actually charged by the plaintiffs, but only prescribe the rates to be included in the plaintiffs' budget requests.

"The section itself states only that 'In computing student fees the revenue figures were derived according to the following schedule.' It does not expressly require the plaintiffs to charge the fees listed, nor does it expressly provide for any reduction in appropriations if the plaintiffs charge greater or lesser fees. However, by using such a schedule to compute the revenue figures of the plaintiffs' institutions, the legislature is, in effect, prescribing a minimum student fee to be charged by each institution. For example, for each of the plaintiffs' institutions the legislature has established an undergraduate student fee of $21.00 per semester hour. By multiplying the number of undergraduates by $21.00 per each semester hour taken, the legislature derives the total undergraduate student fees received by the institution. This figure is then subtracted, along with any other income received by the institution, from the institution's gross operating expenses in order to arrive at the net general fund to be appropriated to maintain the institution.

"Thus, it can be seen that the fee schedule is more than a mere accounting procedure. If the university is actually charging a student fee of $20.00 per semester hour the legislature will still compute its revenue on the basis of $21.00 per semester hour. The legislature will be crediting the university with more income than it is actually receiving, and the net effect will be a reduction in state appropriations. The fee schedule, therefore, establishes a minimum rate to be charged by the plaintiffs, for if the plaintiffs charge their students less, they will automatically be reducing their net state appropriations. Further, if the plaintiffs charged a greater fee than that listed in the schedule the first provision of section 26 would automatically reduce the appropriations already made by the amount of the increase. Thus, by establishing both the maximum and minimum student fee the legislature has directly prescribed the exact student fee to be charged by the plaintiffs."

Since under § 26 plaintiffs can in no way increase their revenues by raising the tuition rate

subsequent to the legislative appropriation, and since plaintiffs in effect cannot decrease their tuition rate below the figure utilized by the Legislature in computing the appropriation, § 26 comprises an ingenious method by which the Legislature seeks to regulate university tuition rates and thus attempts to indirectly what it admittedly cannot do directly. Thus, the trial court correctly declared § 26 to be an unconstitutional infringement of plaintiffs' exclusive authority to establish tuition rates.

### III.

Lastly, we examine the claim made by the Michigan State Board of Education, that they have authority over the governing boards of the state universities.

The State Board of Education was established as a constitutional body corporate by Article VIII, § 3, of the Michigan Constitution of 1963, which provides in part:

"Leadership and general supervision over all public education, including adult education and instructional programs in state institutions, except as to institutions of higher education granting baccalaureate degrees, is vested in a state board of education. It shall serve as the general planning and coordinating body for all public education, including higher education, and shall advise the legislature as to the financial requirements in connection therewith."

Section 3, Article VIII, Constitution of 1963, after providing for the state board, the superintendent of public instruction, and the election of its members, concludes with the following clear and unambiguous language:

"The power of the boards of institutions of higher education provided in this constitution to supervise their respective institutions and control and direct the expenditure of the institutions' funds shall not be limited by this section."

In determining the meaning of this constitutional language, we must first apply the test set forth in *Bond v Ann Arbor School District,* 383 Mich 693, 699–700 (1970):

"The first rule a court should follow in ascertaining the meaning of words in a constitution is to give effect to the plain meaning of such words as understood by the people who adopted it. See *People, ex rel. Twitchell v Blodgett* (1865), 13 Mich 127, 141, 167; *People v Board of State Canvassers* (1949), 323 Mich 523, 528, 529; and *Michigan Farm Bureau v Secretary of State* (1967), 379 Mich 387, 390, 391."

Here, the straightforward language of this sentence has a plain meaning, namely, that whatever may be the role of the board in serving as a general planning and coordinating body, that role was not to limit, interfere, or in any way diminish the "power" of the universities' boards of control "to supervise their respective institutions and control and direct the expenditure of the institutions' funds". The authority claimed by the State Board of Education is not granted them by the Constitution.

We further note that the limitation on the authority of the board with respect to the appellee institutions was explained by the Constitutional Convention in its "Address to the People" as follows:

"The concluding paragraph of [Article VIII, Section 3] preserves for boards of institutions of higher education the power to supervise their respective institutions and

control and direct the expenditures of their funds *as at present."* (Emphasis added.)

It is obvious that what the members of the Constitutional Convention must have had in mind was the long series of Supreme Court decisions and Attorney General opinions, discussed above, which established the independent authority of the universities to be free from legislative interference in the operation of their respective institutions.

Thus, it was never contemplated by the drafters of the Constitution of 1963 that the state board would have any authority over the constitutionally sanctioned governing boards of the universities.

The judgment of the trial court is affirmed. No costs, a public question is involved.

All concurred.