REGENTS OF THE UNIVERSITY OF MICHIGAN v STATE OF MICHIGAN

Docket No. 54966. Argued May 7, 1974 (Calendar No. 1).—Decided October 28, 1975.

The Regents of the University of Michigan, the Board of Trustees of Michigan State University, and the Board of Governors of Wayne State University brought an action for declaratory judgment against the State, the State Treasurer, and the Budget Director, questioning the constitutionality of §§ 13, 20, and 26 of 1971 PA 122, the higher education appropriation act of 1971. The State Board of Education intervened as a defendant, seeking an interpretation of its function under Const 1963, art 8, § 3. The Ingham Circuit Court, Marvin J. Salmon, J., found 1971 PA 122, §§ 13, 20, and 26, unconstitutional. It further found that Const 1963, art 8, § 3, did not require the plaintiffs to obtain the prior approval of the State Board of Education to expand or establish programs or departments, or expand branch campuses, but that the board's authority was limited to recommending to and advising the Legislature as to the desirability of the plaintiffs' plans and requests for funds. The Court of Appeals, McGregor, P. J., and Bronson and Targonski, JJ., affirmed (Docket No. 13422). Defendants and intervening defendant appeal. The plaintiffs assert that 1971 PA 122 infringes upon their constitutional autonomy by limiting the numbers of out-of-state students and establishing the minimum tuition to be paid by them, unduly restricting the construction of buildings or operation of institutions of higher education and effectively requiring that there be no raise in tuition or student fees. The State Board of Education contends that the constitutional requirement that it serve as the general planning and coordinating body for all public education includes authority over new programs instituted by plaintiffs. The opinion of the Court, by Coleman, J. (T. G. Kavanagh, C. J., and Levin and Fitzgerald, JJ., concurring) *held:*

REFERENCES FOR POINTS IN HEADNOTES

[1] 16 Am Jur 2d, Constitutional Law § 88.

[2–4, 7–16, 19] 15 Am Jur 2d, Colleges and Universities § 30.

[5, 6, 17, 18] 64 Am Jur 2d, Public Securities and Obligations § 13.

1. The language in dispute in §§ 13 and 26 and the first sentence of § 20 has not been repeated in appropriation acts subsequent to 1971, so it is inappropriate for the Court to address the issues.

2. The second sentence of § 20, which requires that a university submit to the Legislature schedules for the liquidation of the debt for construction and operation of a self-liquidating project, is a reporting measure without supervision or control by the Legislature, and is constitutional. The universities may enter into contracts for self-liquidating projects without prior legislative approval.

3. The Court abstains from decision on the third sentence of § 20, which prohibits the use of operating funds for the construction, maintenance, or operation of self-liquidating projects, until a specific factual situation is presented.

4. Under Const 1963, art 8, § 3, the State Board of Education is an advisory body as to the universities, without power to veto their programs. The universities are required to inform the board of proposed programs and their financial requirements so that the board may carry out its advisory duties. Failure of the board to recommend favorably to the Legislature does not preclude any of the universities from going directly to the Legislature with its proposals and requests. The independence of the universities remains unchanged by this section of the constitution.

Williams, J., in a separate opinion, agreed as to §§ 13 and 26, the first two sentences of § 20, and the construction of Const 1963, art 8, § 3, but dissented as to the third sentence of § 20. He would hold it to be an unconstitutional prohibition restricting the independent judgment of the governing boards made in a general fund appropriation. Such a prohibitory condition in a general fund appropriation is unacceptable because it does not give the universities the option to refuse the appropriation and avoid the condition or accept the appropriation and accept the condition, thus leaving the management decision to the universities.

47 Mich App 23; 208 NW2d 871 (1973) affirmed in part.

## OPINION OF THE COURT

1. CONSTITUTIONAL LAW—CONSTRUCTION—INTENT—COMMITTEE DEBATES.

The constitutional convention committee debates are individual expressions of concepts as the speakers perceive them and, although they are sometimes illuminating, they are not deci-

sive as to the intent of the general convention or of the people in adopting the measures; therefore, the Court will turn to the committee debates only in the absence of guidance in the constitutional language as well as in the "Address to the People", or when it finds in the debates a recurring thread of explanation binding together the whole of a constitutional concept.

2. COLLEGES AND UNIVERSITIES—APPROPRIATIONS—CONDITIONS—CONSTITUTIONAL LAW.

The Legislature may not interfere with the management and control of a constitutional college or university by the conditions imposed on an appropriation to it, but within that limitation the Legislature may appropriate state funds for a special purpose and if the university accepts the appropriation, it must use the funds for that purpose.

3. COLLEGES AND UNIVERSITIES—APPROPRIATIONS—STATUTES—CONSTITUTIONAL LAW.

It is not necessary to resolve the question of the constitutionality of two sections of the higher education appropriation act of 1971 where the challenged provisions have not appeared in subsequent appropriation acts (1971 PA 122, §§ 13, 26).

4. COLLEGES AND UNIVERSITIES—APPROPRIATIONS—CONDITIONS—CONSTITUTIONAL LAW.

It is not necessary to resolve the question of the constitutionality of a sentence in the higher education appropriation act of 1971 which specified a condition of the appropriation where in later higher education appropriation acts the language has been changed from "it is a condition of this appropriation" to "it is the legislative intent" (1971 PA 122, § 20).

5. COLLEGES AND UNIVERSITIES—APPROPRIATIONS—DEBT—SELF-LIQUIDATING PROJECT—CONSTITUTIONAL LAW.

A sentence in the higher education appropriation act of 1971 which requires that a university submit to the appropriate legislative committees schedules for the liquidation of the debt for construction and operation of a self-liquidating project is constitutional (1971 PA 122, § 20).

6. COLLEGES AND UNIVERSITIES—CONSTITUTIONAL LAW.

The Supreme Court declines to pass upon the constitutionality of a sentence in the higher education appropriation act of 1971 which precludes the use of operating funds to pay for the construction, maintenance, or operation of any self-liquidating

project until there is a specific impasse because without one there are no facts on which a decision can be made (1971 PA 122, § 20).

7. COLLEGES AND UNIVERSITIES—STATE BOARD OF EDUCATION—CONSTITUTIONAL LAW.

The planning and coordinating function of the State Board of Education in the Constitution as it pertains to state universities is advisory in nature, and the authority claimed by the board, that its prior approval is necessary to any new program or construction of a university, is not granted by the Constitution; however, the universities must inform the board of proposed new programs and the estimated financial requirements for each so that the board may advise the Legislature (Const 1963, art 8, § 3).

OPINION DISSENTING IN PART

WILLIAMS, J.

See headnotes 3, 4, and 7.

8. COLLEGES AND UNIVERSITIES—APPROPRIATIONS—CONDITIONS.

*The conditions in an appropriation act for a constitutional university may not be designed to permit the Legislature to accomplish indirectly that which it may not do directly, interfere with the management and control of the affairs of the university.*

9. COLLEGES AND UNIVERSITIES—APPROPRIATIONS.

*Where state appropriations are not involved, the Legislature may not require that branches and departments of the constitutional universities be established or that these may not be established.*

10. COLLEGES AND UNIVERSITIES—APPROPRIATIONS—CONTROL.

*The constitutionally independent universities have exclusive control over general funds appropriated for the general purposes of the schools.*

11. COLLEGES AND UNIVERSITIES—EXPENDITURES—DISCRETION.

*The governing board of a constitutionally independent university has absolute discretion to determine expenditures of funds once they have become part of the university's funds.*

12. COLLEGES AND UNIVERSITIES—APPROPRIATIONS—REDUCTIONS.

*While the Legislature may reduce general levels of appropriations to a constitutionally independent university, it may not*

specifically earmark reduced levels of expenditures to apply to specific units of the university.

13. COLLEGES AND UNIVERSITIES—FUNDS—CONTROL.

The Legislature may not interfere with funds of a constitutional university derived from sources other than state appropriations.

14. COLLEGES AND UNIVERSITIES—APPROPRIATIONS—CONDITIONS.

The state may attach specific conditions to appropriations to a constitutionally independent university, but may not interfere with the exclusive expenditure of such funds once they pass under the control of the university; such conditional appropriations may not be part of the general appropriation.

15. COLLEGES AND UNIVERSITIES—APPROPRIATIONS—CONDITIONS—MANAGEMENT—CONSTITUTIONAL LAW.

The Legislature has power to condition specific or supplementary appropriations to a constitutional university and once these funds are accepted the university is bound by the conditions, but the Legislature may not interfere with the management of a constitutionally independent university, even to ensure that the funds are spent as required. ·

16. COLLEGES AND UNIVERSITIES—CONTROL.

The Legislature cannot prohibit nor require the taking of any particular action by a constitutional university.

17. COLLEGES AND UNIVERSITIES—APPROPRIATIONS—SELF-LIQUIDATING PROJECTS—REPORTS.

The provision in an appropriation act that no contract shall be let for construction of any self-liquidating project at any of the state supported institutions of higher education without first submitting to the appropriate legislative committees schedules for the liquidation of the debt for the construction, maintenance, or operation of such project is valid (1971 PA 122).

18. COLLEGES AND UNIVERSITIES—APPROPRIATIONS—SELF-LIQUIDATING PROJECTS.

The provision in an appropriation act that funds appropriated to the constitutionally independent universities may not be used to pay for the construction, maintenance, or operation of any self-liquidating projects is an unconstitutional prohibition (1971 PA 122).

19. COLLEGES AND UNIVERSITIES—APPROPRIATIONS—CONDITIONS.

A prohibitory condition in a general fund appropriation act to a

> *constitutionally independent university is unacceptable because
> it does not give the university the option to refuse the appropri-
> ation and avoid the condition or to accept the appropriation
> and accept the condition.*

*Miller, Canfield, Paddock & Stone* (by *George E.
Bushnell, Jr.,* and *Gregory L. Curtner) (Roderick
K. Daane,* for the University of Michigan; *Leland
W. Carr, Jr.,* for Michigan State University; and
*Richard Strichartz,* for Wayne State University, of
counsel), for plaintiffs.

*Frank J. Kelley,* Attorney General, *Robert A.
Derengoski,* Solicitor General, and *Eugene Kra-
sicky* and *Gerald F. Young,* Assistants Attorney
General, for defendants and intervening defend-
ant.

M. S. COLEMAN, J. In this declaratory action the
plaintiffs question the constitutionality of 1971 PA
122, §§ 13, 20 and 26. They also seek an interpreta-
tion of Const 1963, art 8, § 3. We do not find it
necessary to resolve the question of the constitu-
tionality of §§ 13 and 26 and the first and third
sentences of § 20. We find the remainder of § 20 to
be constitutional. We further hold the planning
and coordinating function of the State Board of
Education as it refers to plaintiffs in Const 1963,
art 8, § 3, to be advisory in nature.

The plaintiffs (universities) maintain that 1971
PA 122 infringes upon their constitutional auton-
omy by (§ 13) limiting the numbers of and tuition
paid by out-of-state students, (§ 20) unduly restrict-
ing the "construction of buildings or operation of
institutions of higher education" and (§ 26) requir-
ing that there be no raise in tuition or student fees
beyond the amount of revenue reported for budget
purposes. This action has been directed against

defendants State of Michigan; Allison Green, Treasurer; and Glenn S. Allen, Jr., Budget Director.

Only plaintiffs and intervening defendant, Michigan State Board of Education (Board), are concerned in the questions raised by Const 1963, art 8, § 3. The Board contends that the requirement to "serve as the general planning and coordinating body for all public education" includes the authority to approve new programs prior to their implementation by the plaintiffs. Thus it seeks *inter alia* a holding from this Court that the Board of Governors of Wayne State University acted illegally in implementing new doctoral programs in anthropology, electrical engineering and civil engineering, a master's program in occupational therapy, and the Center for Urban Affairs without requesting or obtaining the Board's prior approval. Similarly, the Board declares that the Regents of the University of Michigan lacked the lawful authority to institute a Bachelor of General Studies degree and to expand the University of Michigan Dearborn Campus from a two-year to a four-year institution. The Board also challenges the Board of Trustees of Michigan State University for having established the Center for Race Relations and Urban Affairs without prior approval.

The Ingham Circuit Court found 1971 PA 122, §§ 13, 20 and 26 unconstitutional. It further found that Const 1963, art 8, § 3, did not require the Universities to obtain the prior approval of the Board to "expand or establish programs or departments, or expand branch campuses". The Board's authority was "limited to recommending to and advising the legislature as to the desirability of the plaintiffs' plans and requests for funds".

The trial court was affirmed by the Court of Appeals, 47 Mich App 23; 208 NW2d 871 (1973).

These challenges to the 1971 appropriations act *technically* are moot. Some of the challenged legislative provisions have not appeared in acts subsequent to 1971 and we decline to confront problems where none exist. However, we will address those issues which are of continuing pertinence.

## ISSUES RAISED BY PARTIES

### 1.

Do the conditions and limitations imposed in 1971 PA 122, §§ 13, 20, and 26 (higher education appropriation act of 1971), unconstitutionally intrude upon the authority of the universities as set forth in Const 1963, art 8, §§ 4, 5, and art 5, § 20?

### 2.

Does the provision in Const 1963, art 8, § 3, that the Michigan Board of Education "serve as the general planning and coordinating body for all public education, including higher education" include the authority to veto prior to implementation by the universities?

## GENERAL

Essentially we must address the distribution of power among the Legislature and Governor, the governing boards of the universities and the State Board of Education.

Plaintiffs and defendants cite various portions of convention committee debates with equal authority for opposing views. The impact of some of the arguments diminishes or is nullified when the relevant debates are considered as a whole.

The debates must be placed in perspective. They

are individual expressions of concepts as the speakers perceive them (or make an effort to explain them). Although they are sometimes illuminating, affording a sense of direction, they are not decisive as to the intent of the general convention (or of the people) in adopting the measures.

Therefore, we will turn to the committee debates only in the absence of guidance in the constitutional language as well as in the "Address to the People", or when we find in the debates a recurring thread of explanation binding together the whole of a constitutional concept. The reliability of the "Address to the People" (now appearing textually as "Convention Comments") lies in the fact that it was approved by the general convention on August 1, 1962[1] as an explanation of the proposed constitution. The "Address" also was widely disseminated prior to adoption of the constitution by vote of the people.

The applicable common law is directed largely to pre-Const 1963 language (some of which was retained).

As defendants point out, "[t]his is the first major case in this area of Michigan constitutional law * * * to reach the Court since *State Board of Agriculture v Auditor General,* 226 Mich 417 [197 NW 160]", decided over 50 years ago in 1924 and the first case in this area to reach the Court under the 1963 Constitution.

## 1.

### 1971 PA 122

*Pertinent Constitutional Provisions*

Const 1963, art 8, § 4

"The legislature shall appropriate moneys to main-

---

[1] 2 Official Record, Constitutional Convention 1961, p 3311.

tain the University of Michigan, Michigan State University, Wayne State University, Eastern Michigan University, Michigan College of Science and Technology, Central Michigan University, Northern Michigan University, Western Michigan University, Ferris Institute, Grand Valley State College, by whatever names such institutions may hereafter be known, and other institutions of higher education established by law. The legislature shall be given an annual accounting of all income and expenditures by each of these educational institutions. Formal sessions of governing boards of such institutions shall be open to the public."[2]

## Const 1963, art 8, § 5

" * * * Each board shall have general supervision of its institution and the control and direction of all expenditures from the institution's funds. * * * "[3]

---

[2] Convention Comment:

"This is a revision of Sec. 10, Article XI, of the present [1908] constitution requiring the legislature to appropriate funds to maintain all state-supported institutions of higher education. All such institutions must give an annual accounting to the legislature of all income and all expenditures. This has been done as a matter of practice heretofore by the several institutions.

"Constitutional status is conferred on all state-supported institutions of higher education which are now in existence or which may hereafter be established.

"The concluding sentence of the section insures that formal sessions of the governing boards of such institutions will be open to the public."

[3] Convention Comment:

"This is a revision combining Sections 3, 4, 5, 7, 8 and 16, Article XI, of the present [1908] constitution. The governing boards of the University of Michigan, Michigan State University and Wayne State University are placed on an equal basis in the supervision of their respective institutions and the control and direction of all expenditures from the institutions' funds.

"Each of the boards is permitted to choose the president of its university as presently provided. All three boards are to be equal in size, which enlarges those of Michigan State University and Wayne State University from six to eight members. Such members are all to be elected for eight-year terms and vacancies are to be filled by appointment of the governor."

## Const 1963, art 5, § 20

"No appropriation shall be a mandate to spend. The governor, with the approval of the appropriating committees of the house and senate, shall reduce expenditures authorized by appropriations whenever it appears that actual revenues for a fiscal period will fall below the revenue estimates on which appropriations for that period were based. Reductions in expenditures shall be made in accordance with procedures prescribed by law. The governor may not reduce expenditures of the legislative and judicial branches or from funds constitutionally dedicated for specific purposes."[4]

A capsule history provides perspective to these proceedings.

The University of Michigan was established by act of the Governor and Judges of the Territory of Michigan on August 26, 1817. The act increased the public taxes 15% and appropriated the increase to the university. A priority of expenditure was created, the balance to be utilized "as shall be from time to time by law directed". Control was in the Legislature.

On April 30, 1821, the Governor and Judges repealed the August 26, 1817 act, replacing it by

---

[4] Convention Comment:

"This is a new section designed to provide for executive and legislative controls over state expenditures. The first sentence is intended to cover situations in which unforeseen efficiencies and economies might become possible.

"The second sentence requires the governor, with the approval of the appropriating committees of the legislature, to reduce expenditures whenever it appears that revenues are not meeting estimates for a fiscal period. It is believed that this sentence removes any question as to the constitutionality of legislative control over general fiscal policy of the state. It would require current action to minimize impending year-end deficits.

"The final sentence protects the separation of powers doctrine by preventing executive reductions of expenditures for the co-ordinate legislative and judicial branches of government. It would also prohibit the governor from making reductions in funds dedicated by the constitution for specific purposes."

an act creating the University of Michigan "under the management, direction and government of twenty-one trustees, * * * a body politic and corporate".[5] This body also was given authority (§ 5) to establish such other "colleges, academies and schools" as it thought proper and its funds permitted. Because of a series of Federal acts providing land for support of education in the territories and reliance on its continuation, little reference was made to financial support in early constitutions.[6] Control was in the university.

Mention of the university was made in Const 1835, art 10, § 5, in a section which spoke largely to the preservation of the interest fund derived from sale of part of the Federal lands. However, 1837 PA 55, "An Act to provide for the organization and government of the 'University of Michigan' ", rested the government of the university in a board of regents (§ 3) and gave the regents power to expend all moneys for the use and benefit of the university (§ 17).

Therefore, it appears that the Legislature took general control over this body, but delegated some control back to the regents.

In *Sterling v Regents of University of Michigan,* 110 Mich 369; 68 NW 253 (1896), Justice GRANT wrote of the history of the 1850 Constitution:

"Under the Constitution of 1835, the legislature had the entire control and management of the University and the University fund. * * * The University was not a success under this supervision by the legislature * * * ."

In 1850 the status of the university was re-estab-

[5] 1 Terr L 879.

[6] David B. Laird, *Regents of the University of Michigan and the Legislature of the State, 1920–1950* (thesis in University of Michigan School of Education, 1972).

lished, and Const 1850, art 13, reads in essence the same as the 1908 provision and subsequently the 1963 provision.

Similarly, Michigan State University, the nation's first-land grant college, and Wayne State University, the youngest of plaintiffs, passed through what plaintiffs term "a parallel course of legislative gestation and constitutional maturity".

Although decided long before the ratification of Const 1963, *State Board of Agriculture v Auditor General,* 226 Mich 417; 197 NW 160 (1924), addressed the problem of what, if any, conditions can be imposed by the Legislature on appropriations to constitutionally recognized universities and colleges. As noted, the 1908 constitutional terms establishing the authority of the universities[7] are similar to those employed in the present constitution.

The case substantially limited *Weinberg v Regents of the University,* 97 Mich 246; 56 NW 605 (1893), which had ruled that the Legislature could attach to an appropriation "any conditions it may deem expedient and wise". *State Board of Agriculture* ruled that an appropriation could be based upon a condition that the money be used for a specific purpose—within certain limitations. In speaking of *Weinberg,* the Court said:

"It did not mean that a condition could be imposed that would be an invasion of the constitutional rights and powers of the governing board of the college. It did not mean to say that, in order to avail itself of the money appropriated, the State board of agriculture must turn over to the legislature management and control of the college, or of any of its activities. This logically leads us to a consideration of the character of the condition attached to the appropriation involved in

[7] Const 1908, art 11.

the instant case. Is it a condition that the legislature had a power to make?"

From this case the conclusion can be drawn that some but not all conditions can be imposed upon an appropriation to a constitutional college or university. However, the Legislature may not interfere with the management and control of those institutions. This landmark case makes it clear that the Legislature within those limitations may appropriate state funds for a special purpose and if the university accepts the appropriation, it must use the funds for that purpose.

Much obiter dicta was included in these and a few other cases[8] which we believe would be more confusing than enlightening and therefore omit. Therefore, with this background, we proceed to the present case but with one additional observation. We attribute to the parties that high degree of responsibility and concern for the common good which we have a right to expect from public officials.

### Sections 13 and 26

*Section 13:*

"It is a condition of this appropriation that no college or university having an enrollment of out of state students in excess of 20% of their total enrollment shall increase their enrollment of out of state students in either actual number or percentage over the actual numbers and percentages that were enrolled in the 1970–71 school year.

"Further, it is the intent of the legislature that an out of state student shall pay a student fee equal to

---

[8] *Bauer v State Board of Agriculture,* 164 Mich 415; 129 NW 713 (1911); *Board of Regents of the University of Michigan v Auditor General,* 167 Mich 444; 132 NW 1037 (1911); *State Board of Agriculture v Auditor General,* 180 Mich 349; 147 NW 529 (1914).

approximately 75% of the cost of instruction at the respective institution of higher education."

In subsequent acts, however, the words, "[I]t is a condition of this appropriation" have been changed to "[I]t is legislative intent".

The Legislature has the right to state its advice or wishes through an expression of intent, so we deem it unwise to go forward (or backward) to meet an issue which no longer exists.

*Section 26:*

We find also that the alleged ills of § 26[9] have not appeared in any subsequent act and so likewise we consider it inappropriate to raise problems where none presently exist.

*Section 20*

"It is a condition of this appropriation that none of

---

[9] *Section 26:* "If revenue from tuition and student fees excluding self-liquidating or activity fees exceeds in the aggregate the amount reported by the institutions of higher education in their notification of April 15, 1971 for Michigan resident students as a result of an increase in student fees or tuition the general fund subsidy appropriated for the support of that branch or institution of higher education shall automatically be reduced by the amount by which such revenue exceeds the amount reported. Each institution of higher education shall certify to the legislature not later than April 15, 1972 the schedule of tuition and student fees applicable to Michigan resident students for the fiscal year 1972–73.

"In computing student fees the revenue figures were derived according to the following schedule:

| Rate Per Semester Hour | | Rate per Quarter Hour | | Institution |
|---|---|---|---|---|
| Under-Graduate | Graduate | Under-Graduate | Graduate | |
| $21.00 | $28.00 | $14.00 | $18.66 | Michigan state university; University of Michigan; Wayne state university * * * " |

the appropriations contained in this act shall be used for the construction of buildings or operation of institutions of higher education not expressly authorized in section 1. No contract shall be let for construction of any self-liquidating project at any of the state supported institutions of higher education without first submitting to the appropriate legislative committees, schedules for the liquidation of the debt for the construction and operation of such project. Funds appropriated herein to each institution of higher education may not be used to pay for the construction, maintenance or operation of any self-liquidating projects."

### First Sentence, § 20

In the recent higher education appropriation acts, this language also has been changed from, "[i]t is a condition of this appropriation" to "[i]t is legislative intent". Therefore as we noted in our analysis of §§ 13 and 26, because the Legislature may certainly indicate its preference without creating problems of constitutional dimension, we will not confront an issue which does not exist.

### Second Sentence, § 20

The second sentence of § 20 requires that a university submit to the appropriate legislative committees schedules for the liquidation of the debt for construction and operation of a self-liquidating project. It does not prohibit the construction of a self-liquidating project. It only provides that the Legislature be informed. It affords the Legislature an overview of the total "plant" and a means by which to plan effectively for legislatively appropriated funds. There is no requirement of legislative approval. It provides only a method of

notice of the total obligations of the universities. We find persuasive the following argument for the state by the Attorney General:

"[T]his requirement of section 20 does not impinge upon plaintiffs-appellees' management of the operation of their respective universities. The universities are free to determine whether they will enter into contracts for the construction of self-liquidating projects. Further, the debt liquidation schedules are something the universities already have in their possession prior to entering into such contracts. Thus, this requirement imposes no burden upon the universities."

As it stands, this is a mere reporting measure, without corollary of supervision or control on the part of the committees receiving the information. Although it is, as plaintiffs claim, a pre-audit rather than post-audit provision, such reporting is merely an attempt to give the Legislature information which should be public knowledge. Universities may still enter into construction contracts for self-liquidating projects without prior legislative approval.

The legitimate interest of the Governor and the Legislature is served by notice of matters of possible consequence to the credit of the state and the total needs of the universities.

Accordingly, we find the second sentence of § 20 to be constitutional.

*Third Sentence, § 20*

The third sentence of § 20 precludes the use of operating funds to pay for the construction, maintenance or operation of any self-liquidating project.

The universities would persuade us that the Legislature has no valid interest in a self-liquidating project because it is just that—self-liquidating or self-supporting. They argue that legislatively appropriated funds are not needed and so no legislative approval is required prior to the letting of such contract. We agree.

Defendants urge that this is a reasonable limitation since, by definition, the projects will generate revenues sufficient to pay for themselves. Further, they contend, if appropriated state funds may be used for self-liquidating projects, each becomes a *"fait accompli* in terms of the legislature having to provide state general fund moneys to be used for its construction, maintenance and operation".

Defendants contend that their carefully calculated appropriations would be meaningless if they could be so easily circumvented. The anticipated level of educational quality could be lowered through such a diffusion of funds. Also, the state therefore could become faced with a need for more money either during the same or following year to "maintain" the institution. State fiscal responsibility would become difficult or impossible to achieve. They argue that the condition has nothing to do with the control and management of the universities.

Defendants maintain that the third sentence is a reasonable fiscal limitation in harmony with the requirements, responsibilities and limitations imposed upon the three branches of government.[10]

However, the parties argue in a vacuum. There are no facts into which we can breathe life, so we perceive danger in conjuring possible instances in which a university might defy legislative interdic-

---

[10] *See Regents of the University of Michigan v Employment Relations Commission,* 389 Mich 96, 108–110; 204 NW2d 218 (1973).

tion or in which the Legislature might wreak vengeance upon the universities. Therefore, it is our conviction that this is an occasion in which wisdom demands abstention until a specific impasse is presented.

In a practical sense, whether the universities may be estopped from using general operating funds to bail out putative self-liquidating projects is not really a constitutional question. It is, as is so much of the attempt to ensure harmony among the branches of our government, a matter of power and politics. As we noted in the last *Auditor General* case, 226 Mich 417, 429; 197 NW 160, 162, the method of ensuring compliance with a condition "will readily suggest itself".

The third sentence of § 20 is a perfectly proper hortatory clause expressing the Legislature's desire to set up an orderly division between self-liquidating and other projects. It probably is good government. The universities would be wise to comply, and in all probability would disregard this legislative expression only to suffer understandable legislative reaction.

This Court therefore is asked to make a declaration of rights which will to some extent be ineffective because the real question here is not judicial power but legislative power.

We commend the Legislature upon its disposition to ensure harmony between two constitutional bodies. It is fundamental to effective and efficient government that the three branches of government make every effort to harmonize their activities and responsibilities. It is academic that whatever powers the universities may constitutionally hold, the Legislature holds the power of the purse. Regardless of what this Court might find, the matter remains one of power and politics.

As a practical matter most of the questions

which arise involve directly or indirectly the Legislature's power of the purse which has a governmental reality which in some ways transcends the significance of the universities' constitutional power, although that cannot be ignored or denied.

It has been observed that our form of democratic government is like the bumblebee which aeronautical engineers say cannot fly—but does. Both presuppose that each segment performs its prescribed function in harmony with all other segments.

## 2.

### CONST 1963, ART 8, § 3

"Leadership and general supervision over all public education, including adult education and instructional programs in state institutions, except as to institutions of higher education granting baccalaureate degrees, is vested in a state board of education. It shall serve as the general planning and coordinating body for all public education, including higher education, and shall advise the legislature as to the financial requirements in connection therewith.

\* \* \*

"The power of the boards of institutions of higher education provided in this constitution to supervise their respective institutions and control and direct the expenditure of the institutions' funds shall not be limited by this section."[11]

Plaintiffs submit that art 8, § 3 has a perfectly

---

[11] Convention Comment:

"This is a new section combining and enlarging upon the provisions in Sections 2 and 6, Article XI, of the present [1908] constitution. It attempts to embody two fundamental principles: (1) the concern of all people in educational processes as a safeguard for democracy; (2) greater public participation in the operation of educational institutions.

"The enlarged state board provides a policy-making body on a state level. Michigan is one of three states that does not have such a board.

plain meaning, namely, that whatever may be the role of the Board in serving as a general planning and coordinating body, that role is not to limit, interfere with or in any way diminish the power of the universities' boards of control to supervise their respective institutions and control and direct the expenditures of the institution's funds. Plaintiffs assume that their supervisory powers together with their control of expenditures over their funds authorize them to expand their respective educational programs via construction if need be without prior approval of the Board.

The Board contends that its prior approval is necessary to any new program or construction.

The parties argue the plain meaning of the section to contrary conclusions.

Section 3 begins with the word "Leadership". This word does not mean or imply control, domination or authority over other boards or institutions. The term "general supervision" is modified by the words "except as to institutions of higher education granting baccalaureate degrees". It follows that the Board specifically was not granted general supervision over the universities, but was afforded leadership.

---

Creation of a state board places the superintendent in the position of having constantly available a consultative and deliberative body of outstanding citizens who are representative of the people of the state.

\* \* \*

"It is proposed that the board be the unifying and coordinating force for education within the state and receive information from all of the various levels of public education. Such information would be considered by the board in determining advice to local school boards, governing boards of colleges and universities and the legislature as to the total needs of education in this state.

\* \* \*

"The concluding paragraph of the section preserves for boards of institutions of higher education the power to supervise their respective institutions and control and direct the expenditure of their funds as at present."

The section further provides that the Board "shall serve as the general planning and coordinating body for all public education". This is a grant of general power but within the terms of "planning and coordinating" and not with any control, domination or authority over the excepted institutions.

The second sentence provides that the Board "shall advise the legislature as to the financial requirements in connection therewith". The word "advise" does not grant decisional power to the Board over the universities' boards. The words "financial requirements" are limited by "in connection therewith", referring to the "planning and coordinating". It does not appear that the constitutional convention intended that the Board be a dominating authority over the universities.

This conclusion is materially reinforced by the last sentence of § 3.

The Convention Comment is not necessary to the interpretation, but it was voted upon by the delegates and underscores this interpretation. The delegates explained that they intended the Board to be the unifying and coordinating force for education, receiving information so that the said Board could advise the universities and the Legislature as to the total needs of education within the state.

The comment ends by emphasizing that the section preserves to the universities (and others) the "power to supervise their respective institutions and control and direct the expenditure of their funds *as at present*". (Emphasis added.) Emphasis of the words "as at present" is found also in the convention debates, referring to 1962, a time at which there was no question of the absolute

independence of the universities vis-a-vis the Board.[12]

Michigan is one of the few states to give independent constitutional status to its universities. When considering and voting upon the new constitution, the voters had before them the constitutional language and the explanatory "Convention Comments" adopted by the delegates. Therefore, it is not the prerogative of this Court to change the plain meaning of words in the constitution "as

---

[12] For example: In speaking of the recommendations of the State Board, Mr. Romney:

" * * * Now this does not preclude separate universities from going directly to the legislature if they do not agree with the recommendations of the board. * * * I think it is important to know that the enlargement of the board's activities does not increase the authority of the board beyond that now granted in the present constitution to the superintendent of public instruction. (1 Official Record, Constitutional Convention 1961, p 1190.)

\* \* \*

"Now, in the case of the universities, the state board of education does not have general supervision and there is no conflict there so far as I can see." (1 Official Record, Constitutional Convention 1961, p 1191.)

Also, in speaking of the information to be gathered from all levels of education, Mrs. Conklin:

"Such information shall be used in order that the state board of education may adequately consider and advise local school boards, governing boards of colleges and universities, the legislature and the people as to the total needs of education in this state and make recommendations concerning their solution." (1 Official Record, Constitutional Convention 1961, p 1181.)

As to the powers of the Universities, there was a consistent effort to retain the language of the prior constitution because the Universities had flourished under it so well in the past. For instance, Mr. Bentley, in fighting off an unsuccessful attempt to amend, said, "We have adopted insofar as possible the language of the existing constitution". Mr. Downs agreed, saying in part, "I believe that our historical language giving the governing body of the university general supervision has proven to be very well understood. * * * This system has worked out historically, and I urge our retention of the original language that the chairman has supported." (1 Official Record, Constitutional Convention 1961, p 1152.) Mr. Norris further explained regarding the Universities, "The whole idea is to make them, in fact, the policymakers of these respective institutions and to continue the international reputation which has thus far been afforded to these institutions". (1 Official Record, Constitutional Convention 1961, p 1185.)

understood by the people who adopted it". *Bond v Ann Arbor School Dist,* 383 Mich 693; 178 NW2d 484 (1970).

We agree with the Court of Appeals that "[t]he authority claimed by the State Board of Education is not granted them by the Constitution".

However, the words, "[i]t shall serve as a general planning and coordinating body for all public education, including higher education, and shall advise the legislature as to the financial requirements in connection therewith" must be granted meaning.

It is our opinion that the universities must inform the Board of proposed new programs and the estimated financial requirements for each. From information before the Court, it appears that the current procedure is to submit proposals for new academic programs on a form supplied by Higher Education Management Services of the Board. This includes estimated total capital outlay needs for the first five years. The proposals are submitted to the Board for "approval".

We interpret "approval" as meaning only advice to the Legislature and to the universities. This advice relates to the overall planning and coordinating function of the Board and in no way carries with it the power to veto the proposed programs. In this context, the procedure is consistent with the constitutional language.

In other words, the Board is advisory in nature. However, in order to advise, it requires information. It is necessary to the intent of the Constitution that the Board be informed of proposed new programs. Failure of the Board to recommend favorably to the Legislature or to act at all does not preclude any of the universities from going directly to the Legislature with its proposals and

requests. The only requirement resting upon the univsersities is to inform the Board so that it can knowledgeably carry out its advisory duties. The autonomy and independence of the universities remain "as in the past".

3.

This case arises because two important elements of our government, the Legislature and the universities, are zealous to perform well their constitutional missions in the service of the people. The Legislature has taken certain action pursuant to its responsibilities to supervise properly the spending of the people's money. The universities seek to maintain their constitutional integrity to manage funds given into their charge in order best to perform their educational mission. It is obvious that these two functions can touch or overlap each other. Therefore understanding and good will is necessary that the people whom both elements represent be best served.

In this declaration of right the Court is not called upon to give its opinion as to whether the legislation in question is good public policy and the best part of wisdom for the Legislature and the universities to follow. We are asked only whether the legislative conditions invade the constitutional jurisdiction of the universities. Therefore, our conclusions based on the Constitution and the foregoing precedents and our analysis of the lessons they teach can be seen only in that perspective.

The parties have not asked this Court to alter or abolish any existing program. The parties have indicated only a desire to see the law settled.

Our decision provides guidance for future conduct. We do not intend that it be an instrument

for voiding past practices and procedures. Therefore, our holdings are given prospective effect only. No costs are assessed, this being a public question.

The Court of Appeals is hereby affirmed only to the extent not inconsistent with this opinion.

T. G. KAVANAGH, C. J., and LEVIN and J. W. FITZGERALD, JJ., concurred with M. S. COLEMAN, J.

WILLIAMS, J. *(re § 20 only).* I dissent as to § 20, third sentence. I sympathize with the feeling of my colleagues that the universities have been unwise and impolitic in seeking a resolution of these particular differences with the Legislature in this forum, and that by and large the universities and the Legislature have commendably resolved their problems by working together. However, I believe the opinion of the majority effectively ignores the precedent of a number of the decisions of this Court, which have, for over 100 years, set a pattern for the successful and generally harmonious cooperation of these two constitutional entities. In addition to attempt to dismiss certain decisions as confusing obiter dicta is to ignore what our predecessors actually held in these decisions.

## I—FACTS

Plaintiffs question the constitutionality of the higher education appropriation act of 1971, PA 122, §§ 13, 20 and 26, as conflicting with Const 1963, art 8, § 1 and § 5 in this declaratory action.

My Sister COLEMAN has well and ably detailed the facts of the dispute, and we are in accord with her proposed resolution of § 13 and § 26 and with her interpretation of Const 1963, art 8, § 3. We therefore turn to a discussion and analysis of § 20.

## II—THE STATUTE AND THE CONSTITUTION

This is the first case in this area to reach our Court under the 1963 Constitution. Constitutional sections relevant to our discussion are contained in article 8 (emphasis added):

"Sec. 4. The *legislature shall appropriate moneys to maintain* the University of Michigan, Michigan State University, Wayne State University, Eastern Michigan University, Michigan College of Science and Technology, Central Michigan University, Northern Michigan University, Western Michigan University, Ferris Institute, Grand Valley State College, by whatever names such institutions may hereafter be known, and other institutions of higher education established by law. *The legislature shall be given an annual accounting of all income and expenditures by each of these educational institutions.* Formal sessions of governing boards of such institutions shall be open to the public."

"Sec. 5. The regents of the University of Michigan and their successors in office shall constitute a body corporate known as the Regents of the University of Michigan; the trustees of Michigan State University and their successors in office shall constitute a body corporate known as the Board of Trustees of Michigan State University; the governors of Wayne State University and their successors in office shall constitute a body corporate known as the Board of Governors of Wayne State University. *Each board shall have general supervision of its institution and the control and direction of all expenditures from the institution's funds.* Each board shall, as often as necessary, elect a president of the institution under its supervision. He shall be the principal executive officer of the institution, be ex-officio a member of the board without the right to vote and preside at meetings of the board. The board of each institution shall consist of eight members who shall hold office for terms of eight years and who shall be elected as provided by law. The governor shall fill board vacancies by appointment. Each appointee shall hold

office until a successor has been nominated and elected as provided by law."

Section 20 of the higher education appropriation act of 1971 provides:

"It is a condition of this appropriation that none of the appropriations contained in this act shall be used for the construction of buildings or operation of institutions of higher education not expressly authorized in section 1. No contract shall be let for construction of any self-liquidating project at any of the state supported institutions of higher education without first submitting to the appropriate legislative committees, schedules for the liquidation of the debt for the construction and operation of such project. Funds appropriated herein to each institution of higher education may not be used to pay for the construction, maintenance or operation of any self-liquidating projects."

### III—RELEVANT PRECEDENT

This Court has, in the past, had to attempt to reconcile similar appropriation restrictions with similar constitutional provisions.[1] All decisions

---

[1] A form of the present constitutional provision providing for university autonomy appeared in earlier incarnations:

"[A]nd it shall be the duty of the legislature, as soon as may be, to provide effectual means for the improvement and permanent security of the funds of said university." Const 1835, art 10, § 5.

"The [University of Michigan] board of regents shall have the general supervision of the university and the direction and control of all expenditures from the university interest fund." Const 1850, art 13, § 8.

"The [University of Michigan] board of regents shall have the general supervision of the university and the direction and control of all expenditures from the university funds." Const 1908, art 11, § 5.

"The board [of trustees] shall have the general supervision of Michigan state university, and the direction and control of all Michigan state university funds; and shall perform such other duties as may be prescribed by law." Const 1908, art 11, § 8.

"The board of governors of Wayne state university shall have general supervision of Wayne state university and the duties of said

have reinforced the concept of university autonomy.

Thus, in 1856, when faced with a petition for mandamus against the Regents of the University of Michigan to require them to establish a professorship in homeopathy,[2] we noted:

"*The respondents are constitutional officers, to whom are confided by the constitution (art. xiii, § 8) 'the general supervision of the university, and the direction and control of all expenditures from the university interest fund.'* They are elected by the people. They come at short intervals fresh from the body of the people, and cannot be supposed to be influenced by sentiments not common to those they represent. To their judgment and discretion as a body is committed the supervision of the financial and all other interests

board shall be prescribed by law. The legislature shall be given an annual detailed accounting of all income from whatever source derived by and all expenditures by Wayne state university." Const 1908, art 11, § 16.

"The legislature shall maintain the university, * * * the state agricultural college, * * * and other educational institutions, as may be established by law." Const 1908, art 11, § 10.

"The legislature shall appropriate moneys to maintain the University of Michigan, Michigan State University, Wayne State University * * * . The legislature shall be given an annual accounting of all income and expenditures by each of these educational institutions." Const 1963, art 8, § 4.

"Each board [University of Michigan, Michigan State University, Wayne State University] shall have general supervision of its institution and the control and direction of all expenditures from the institution's funds." Const 1963, art 8, § 5. [Plaintiff's brief, 20–22]

[2] The application was based on a law providing:

"that 'the regents shall have power to enact ordinances, by-laws, and regulations for the government of the university; to elect a president; to fix, increase and reduce the regular number of professors, and tutors, and to appoint the same, and to determine the amount of their salaries: *Provided,* That there shall always be at least one professor of homeopathy in the department of medicine.'"

1855 PA 100, quoted in *People v Regents,* 4 Mich 98, 99 (1856). We found it unnecessary to reach the constitutionality of the requirement that there be a professor of homeopathy. 4 Mich 98, 103. However, that issue was raised in two later cases, but a divided Court was unable to resolve it. *People v Regents of the University,* 18 Mich 469, 482 (1869). *People v Regents of the University,* 30 Mich 473 (1874).

of an institution in which all the people of this state have a very great interest." *People v Regents,* 4 Mich 98, 104 (1856).

The writ was denied because, in view of the broad discretion accorded the Board of Regents, it had not been demonstrated that they were seeking to evade the law.

The issue was clearly faced when we were asked to determine whether a statute requiring sufficient security by bond for the payment of labor and material claims resulting when public buildings were built or otherwise improved at state expense[3] applied to the Regents of the University of Michigan. In *Weinberg v Regents of the University of Michigan,* 97 Mich 246; 56 NW 605 (1893), we held that it did not.

It was in this decision that we first articulated the distinction between the constitutionally-created and independent nature of the university and that of other state institutions.

"These institutions are the creations of the Legislature. They are under the exclusive control and management of the State. The State, which created them, may at any time repeal the laws by which they were established, and sell the property." 97 Mich 246, 252.

On the other hand, "the general supervision of

---

[3] "The section, as amended by Act No. 45, Laws of 1885, provides:

" 'That when public buildings or other public works or improvements are about to be built, repaired, or ornamented under contract, at the expense of this State, or of any county, city, village, township, or school-district thereof, it shall be the duty of the board of officers, or agents, contracting on behalf of the State, county, city, village, township, or school-district, to require sufficient security by bond for the payment by the contractor and all subcontractors for all labor performed or materials furnished in the erection, repairing, or ornamenting of such building, works, or improvements.' " *Weinberg v Regents,* 97 Mich 246, 249–250; 56 NW 605 (1893).

the University is, by the Constitution, vested in the Regents". 97 Mich 246, 253. Therefore,

"The University is the property of the people of the State, and in this sense is State property, so as to be exempt from taxation. *Auditor General v Regents,* 83 Mich 467 [1890]. But the people, who are the corporators of this institution of learning, have, by their Constitution, conferred the entire control and management of its affairs and property upon the corporation designated as 'the Regents of the University of Michigan,' and have thereby excluded all departments of the State government from any interference therewith. The fact that it is State property does not bring the Regents within the purview of the statute. The people may, by their Constitution, place any of its institutions or property beyond the control of the Legislature." 97 Mich 246, 254–255.

Thus, *Weinberg* was clear in emphasizing that the Legislature could not intrude upon the independence of the Regents in their management of the university. However, in obiter dicta it left open for later courts to clarify how this prohibition affected the nature of the Legislature-University relationship when appropriations were concerned.

"Under the Constitution, the State cannot control the action of the Regents. It cannot add to or take away from its property without the consent of the Regents. *In making appropriations for its support, the Legislature may attach any conditions it may deem expedient and wise, and the Regents cannot receive the appropriation without complying with the conditions.* This has been done in several instances.

"Property aggregating in value nearly or quite half a million of dollars has been donated to the University by private individuals. Such property is the property of the University. It is not under the control of the State when it acts through its executive or legislative depart-

ments, but of the Regents, who are directly responsible to the people for the execution of their trust. So, when the State appropriates money to the University it passes to the Regents, and becomes the property of the University, to be expended under the exclusive direction of the Regents, and passes beyond the control of the State through its legislative department." 97 Mich 246, 254. (Emphasis added.)

Thus, once the Legislature appropriated funds to the university, those funds passed beyond legislative control, and their management was left solely to the discretion of the regents. However, before the funds got to the university, the Legislature could establish certain conditions. The university could not accept these appropriations without complying with the conditions. It is interesting there is no citation of the cases relied on allowing these conditions. We have been referred to none and know of none where this was the dispositive issue. The question for future courts to consider then became, what conditions could the Legislature constitutionally attach to university appropriations?

In *Sterling v Regents of University of Michigan,* 110 Mich 369; 68 NW 253 (1896), we reviewed the by then well-established historical independence of the university, 110 Mich 369–380, and noted that:

"for 46 years [the regents] have declined obedience to any and every act of the legislature which they, upon mature reflection and consideration, have deemed against the best interests of the institution. This court has sustained them in that position, and has on every occasion when asked denied its writ to interfere with their action." 110 Mich 369, 379.

The act in question was but another chapter in the legislatively-mandated desire to regulate the

teaching of homeopathy.[4] The *Sterling* decision
most effectively stated the rationale for holding
unconstitutional such attempts to interfere with
the independence of the University:

"Now, in the face of the facts that the regents have
for 46 years exercised such control, and openly asserted
their exclusive right to do so; that the courts have
refused to compel them to comply with the acts of the
legislature; that this court held in *Weinberg v Regents*,
97 Mich 246, that they were a constitutional body, upon
whom was conferred this exclusive control; and in the
face of this plain constitutional provision,—this court is
now asked to hold that the regents are mere ministerial
officers, endowed with the sole power to register the
will of the legislature, and to supervise such branches
and departments as any legislature may see fit to
provide for. By the power claimed, the legislature may
completely dismember the University, and remove ev-
ery vestige of it from the city of Ann Arbor. It is no
argument to say that there is no danger of such a
result. The question is one of power, and who shall say
that such a result may not follow? The legislature did
once enact that there should be a branch of the Univer-
sity in every judicial circuit. If the regents comply with
the present act, the next legislature may repeal it, and
restore that department to the University at Ann Ar-
bor, or place it elsewhere. *Some legislatures have at-
tached conditions—and they have the undoubted right
to do so—to appropriations for the support of the Uni-
versity, and a subsequent legislature has removed the
conditions.* Some legislatures have attached to appropri-

[4] "In 1895 the legislature passed Act No. 257, Pub. Acts 1895, the
material part of which reads as follows:
" 'That the board of regents of the University of Michigan are
hereby authorized and directed to establish a homeopathic medical
college as a branch or department of said University, which shall be
located in the city of Detroit, and the said board of regents are hereby
authorized and directed to discontinue the existing homeopathic
medical college now maintained in the city of Ann Arbor as a branch
of said University, and to transfer the same to the city of Detroit.' "
*Sterling v Regents of University of Michigan*, 110 Mich 369, 370; 68
NW 253 (1896).

ations the condition for the establishment of a homeo-
pathic professorship in the old medical department.
Other legislatures have refused to attach any such
condition. *What permanency would there be in an
institution thus subject to the caprice and will of every
legislature?* Under this power, the legislature could
remove the law department from the University at Ann
Arbor to Detroit, and provide that the law library, to
which one citizen of Michigan has donated $20,000,
should also be removed. It might scatter its great
library (to the collection of which private citizens have
contributed nearly or quite one-half), and also its great
museums, laboratories, and mechanical appliances.
Other results will readily suggest themselves. It ap-
pears to us impossible that such a power was contem-
plated.

"Furthermore, it renders nugatory the express provi-
sion of the Constitution that 'the regents shall have the
direction and control of all expenditures from the Uni-
versity interest fund.' It is significant that, at the time
of the adoption of the Constitution, this fund consti-
tuted the sole support of the University, aside from fees
which might be received from students. The State had
made no appropriations for its support, and there is
nothing to indicate that any such appropriations were
contemplated. It is unnecessary to argue that the above
provision means what it says, and that it takes away
from the legislature all control over the income from
that fund. The power therein conferred would be with-
out force or effect if the legislature could control these
expenditures by dictating what departments of learning
the regents shall establish, and in what places they
shall be located. Neither does it need any argument to
show that the power contended for would take away
from the regents the control and direction of the ex-
penditures from the fund. *The power to control these
expenditures cannot be exercised directly or indirectly
by the legislature. It is vested in the board of regents in
absolute and unqualified terms.* This act, in express
terms, prohibits the regents from using any of this fund
to support a homeopathic department at the University
at Ann Arbor, since it prohibits them from maintaining

such a department there." 110 Mich 369, 380–381.
(Emphasis added.)

In sum, the Board of Regents and the Legislature derive their power from the same supreme authority, the Michigan Constitution, and "in every case except that of the regents, the Constitution carefully and expressly reposes in the legislature the power to legislate and to control and define the duties of those corporations and offices. * * * [T]he intention was to place this institution [the university] in the direct and exclusive control of the people themselves, through a constitutional body elected by them." 110 Mich 369, 383.

Therefore, although *Sterling* did not involve a legislative appropriation, it does give us important guidance in determining what conditions may be attached to such appropriations:

1. The condition may not be designed to permit the Legislature to indirectly accomplish that which it may not do directly, interfere with the management and control of university affairs. 110 Mich 369, 381.

2. Where state appropriations are not involved, the Legislature may not require that branches and departments of the university be established, 110 Mich 369, 380, or, that these may not be established. 110 Mich 369, 381.

In *Bauer v State Board of Agriculture,* 164 Mich 415; 129 NW 713 (1911), mandamus was petitioned for in order to prevent Michigan Agricultural College (now Michigan State University) from constructing a United States post office in East Lansing. We rejected petitioner's contention that the

college did not have the power to engage in such business. We held that since the State Board of Agriculture was a constitutional body like the University of Michigan Board of Regents, the case was controlled by *Sterling*. Therefore, as to "the general supervision of the college and the direction and control of all agricultural college funds", 164 Mich 415, 418, we concluded "the State board of agriculture has exclusive supervision and control". 164 Mich 415, 418.

"We do not intend to hold that an act of the board might not be so subversive of the purposes for which the board was created as to warrant the intervention of the courts, but we do not think this record presents such a case, nor do we intend to hold that the legislature may not make appropriations for specific objects or attach conditions which would be binding upon the State board of agriculture in case they accepted the appropriations; but *we do hold that as to the general funds appropriated for the general purposes of the agricultural college, the board has the exclusive control and direction,* to the same extent that we find such power was possessed by the board of regents in the *Sterling Case* above referred to." 164 Mich 415, 418–419. (Emphasis added.)

Thus, *Bauer* established the principle that the *constitutionally-independent universities have exclusive control over "general funds appropriated for the general purposes"* of the schools.

The independent judgment of the Board of Regents that funds were properly expended for the use and operation of the university was held to be superior to that of the Auditor General in *Regents v Auditor General,* 167 Mich 444; 132 NW 1037 (1911). We held that the Auditor General could not

reject vouchers for expenditures[5] once they were authorized by the regents even though the Legislature authorized the Auditor General to do so. 167 Mich 444, 450.

A new legislative appropriation device was invalidated three years later, when we held that the Legislature "exceeded its powers in attempting to deprive the relator [State Board of Agriculture] of its constitutional control of agricultural college funds derived from the Federal government". *State Board of Agriculture v Auditor General,* 180 Mich 349, 359; 147 NW 529 (1914).[6] Once the funds were received from the Federal government for the endowment and maintenance of the agricultural college, they became an agricultural college fund, to be "annually applied to the specific objects of the original gift, grant or appropriation". 180 Mich 349, 359. One purpose of the Federal grant was to maintain a department for the teaching of the mechanic arts. 180 Mich 349, 354. Such maintenance required $61,000 for the year ending June 30, 1913, 180 Mich 349, 355, a vast difference from the $35,000 limit mandated by the disputed act.

Further, we found that a budgetary restriction

---

[5] The relevant portion of this act was:

"*Provided, further,* That the State Treasurer be and is hereby authorized and *directed to pay* to the regents of the University, in the year eighteen hundred ninety-nine and each year thereafter, in such manner as is now provided by law, upon the warrant of the Auditor General, the amount of the mill tax provided for by this act; and that the State Treasury be reimbursed out of the taxes annually received from said mill tax when collected; and said Auditor General shall issue his warrants therefor as in the case of special appropriations." 1899 PA 102, quoted in *Regents v Auditor General,* 167 Mich 444, 448; 132 NW 1037 (1911).

[6] The tax bill provided:

" 'Sec. 1(a). No part of this or any other appropriation shall be available in case a sum in excess of thirty-five thousand dollars from any or all sources, shall be expended in any one fiscal year for the maintenance of the mechanical and engineering department.' " *State Board of Agriculture v Auditor General,* 180 Mich 349, 350; 147 NW 529 (1914).

on the amount to be spent on a particular department amounted to unconstitutional "legislative supervision of the college. * * * It is something more than reducing a general appropriation so that the expenses in some or in all departments of the college must be reduced, leaving the proper supervisors to determine how efficiency can be best maintained under new conditions." 180 Mich 349, 358.

These two *Auditor General* cases tell us:

1. The governing board of a university has absolute discretion to determine expenditures of funds once they have become part of the university's funds.
2. While the Legislature may reduce general levels of appropriations to a university, it may not specifically earmark reduced levels of expenditures to apply to specific units of the university.
3. The Legislature may not interfere with university funds derived from sources other than state appropriations.
4. The state may attach specific conditions to appropriations to the university, but may not interfere with the exclusive expenditure of such funds once they pass under the control of the university.
5. Such conditional appropriations may not be part of the general appropriation.

These principles were further refined in *State Board of Agriculture v Auditor General,* 226 Mich 417; 197 NW 160 (1924).[7] There we said:

---

[7] "This proceeding calls for a construction of Act No. 308, Pub. Acts 1923, which reads:

"'For carrying on the co-operative agricultural extension work under the provisions of an act of congress approved May eight,

1. "There is, however, a distinction between funds received by way of appropriations and other college funds. The appropriation may be upon condition that the money shall be used for a specific purpose, or upon any other condition that the legislature can *lawfully* impose." 226 Mich 417, 424–425. (Emphasis added.)

2. "[A] condition [cannot] be imposed that would be an invasion of the constitutional rights and powers of the governing board of the college *[i.e.,]* management and control of the college, or of any of its activities." 226 Mich 417, 425.

3. Once a conditional appropriation passes into the hands of the college, it becomes its property and is under its exclusive control "but must be used for the purpose for which it was granted". 226 Mich 417, 429.

nineteen hundred fourteen, entitled "An act to provide for co-operative extension work between the agricultural colleges for the several States receiving the benefits of an act of congress approved July two, eighteen hundred sixty-two, and acts supplementary thereto, and the United States department of agriculture," and such other extension work as the State board of agriculture may designate, the sum of

|  | For Fiscal Year 1923–1924 | For Fiscal Year 1924–1925 |
|---|---|---|
| Annual appropriation for extension work. | $150,000.00 | $150,000.00 |
| Special fund for research work........... | 35,000.00 | 35,000.00 |
| Horticultural building including greenhouse and equipment ............... | 200,000.00 | 200,000.00 |
| Extensions and additions to powerhouse and equipment ..................... | 75,000.00 | 75,000.00 |
| Farm and miscellaneous buildings and incidental additions to buildings ....... | 50,000.00 | 50,000.00 |
| Hospital............................... | 50,000.00 |  |
| Totals............................ | $560,000.00 | $510,000.00 |

" 'Each of said amounts shall be used solely for the specific purposes herein stated, subject to the general supervisory control of the State administrative board.' " *State Board of Agriculture v Auditor General,* 226 Mich 417, 418–419; 197 NW 160 (1924).

We held that in attempting to exercise the "general supervisory control" of expenditures, the State administrative board was in effect controlling the work itself, thus "assuming to exercise authority vested by the Constitution solely in the board of agriculture". 226 Mich 417, 425–426.

4. "The proper method of compelling a compliance with the condition that the money shall be expended for the purpose specified will readily suggest itself to the administrative board and its legal advisor." 226 Mich 417, 429.

While it is said that the Legislature has power to condition specific or supplementary appropriations, and that once these funds are accepted the university is bound by the conditions, it is just as clear that the Legislature may not interfere with the management of the university, even to ensure that the funds are spent as required.

One further case touched on the issue in dictum. In *Jackson Broadcasting & Television Corp v State Board of Agriculture,* 360 Mich 481; 104 NW2d 350 (1960), plaintiff attempted to enjoin construction and operation of a television station by the State Board of Agriculture. Plaintiff claimed the project was self-liquidating and therefore violated 1958 PA 224, the general appropriation act for universities.

The relevant section of that act was:

"In view of the fact that state appropriations have been used for certain expenses in connection with self-liquidating projects, no contract shall be let for construction as to any self-liquidation project at any of the state supported institutions of higher education without prior approval therefor by the legislature." 360 Mich 481, 485.

We found that plaintiff failed to establish that the television station was in fact self-liquidating or that general appropriations were to be expended on that project, and noted as well:

"If section 11 of that act were to be construed as a

general prohibition against the board of trustees of
Michigan State University, without regard to the source
of the funds to be used or involved, it would exceed
legislative authority." 360 Mich 481, 497–498.

Therefore, the principles applicable to the de-
claratory action before us become:
1. The Legislature cannot interfere in the man-
   agement of the university.
2. The Legislature cannot prohibit nor require
   the universities to take any particular action.
3. The Legislature cannot impose a condition on
   a general fund appropriation.
4. While there is much dicta saying that the
   Legislature can impose a condition in a spe-
   cial appropriation, we have not been cited nor
   have we found a single case where this was
   the dispositive issue.

## IV—THE STATUTE CONSTRUED

This is a general appropriation act. Section 20 of
the statute contains, in effect, three separate provi-
sions. By analyzing the effect of each requirement
of the university, we can best determine whether
each condition passes constitutional muster.

*1. The First Sentence*

Section 20 first provides:

"It is a condition of this appropriation that none of
the appropriations contained in this act shall be used
for the construction of buildings or operation of institu-
tions of higher education not expressly authorized in
section 1."

We agree with our Sister COLEMAN that the
change in the recent higher education appropria-

tion acts from language of condition to language of intent eliminates constitutional problems which might otherwise exist.

### 2. The Second Sentence

Section 20 then requires:

"No contract shall be let for construction of any self-liquidating project at any of the state supported institutions of higher education without first submitting to the appropriate legislative committees, schedules for the liquidation of the debt for the construction and operation of such project."

As it stands, this is a mere reporting measure, without corollary of supervision or control on the part of the committees receiving the information. Although it is, as plaintiffs claim, a pre-audit rather than post-audit provision, such reporting is merely an attempt to give the Legislature information which should be public knowledge at any rate. Universities may still enter into construction contracts for self-liquidating projects without prior legislative approval. Therefore, the provision is valid.

### 3. The Third Sentence

Section 20 then requires:

"Funds appropriated herein to each institution of higher education may not be used to pay for the construction, maintenance or operation of any self-liquidating projects."

Defendants urge that this is a reasonable limitation since, by definition, the projects will generate revenues sufficient to pay for themselves. Further, they urge, if appropriated state funds may be used for self-liquidating projects, each becomes a *"fait accompli"* in terms of the legislature having to

provide state general fund moneys to be used for its construction, maintenance and operation".

We agree with our Sister COLEMAN that the university calling a project self-liquidating, has, in effect, declared to the Legislature and taxpayers that it is not going to call for any funds and may establish some estoppel.

The provision, however, is an unconstitutional prohibition. Section 20, third sentence involves a prohibitory condition restricting the independent judgment of the Board of Regents. Further, it is a condition made, not in a specific appropriation, but in a general fund appropriation. The Legislature may not thus interfere with the decision-making process of the regents.

As our Sister COLEMAN suggests, this sentence reflects the desire of us all for orderly government. No one can fault the Legislature for what it desires. However, in this instance they chose an unconstitutional method of achieving it. While the legislative intent is understandable in thus laying out appropriate procedures, it is not enough to justify unconstitutional intrusions upon the delicate balance of power the people have decreed.

There are constitutional routes which the Legislature may pursue to achieve its ends. These are too well understood by the Legislature to require spelling out.

V—CONCLUSION

This case arises because two co-equal branches of our government have turned to a third and asked us, as is required by our constitutional role, to declare some of the constitutional ground rules in their cooperation. Insofar as this is a constitutional question, we hold the third sentence sets up

conditions that invade the constitutional jurisdiction of the universities.

1. The Legislature may not interfere with the independence of the universities to manage their institutions and their funds.

2. The Legislature may not attach conditions to a general fund appropriation.

3. A prohibitory condition is unacceptable because it does not give the universities the option to refuse the appropriation and avoid the condition or to accept the appropriation and accept the condition. The latter leaves the management decision to the university. The former unconstitutionally substitutes legislative management.

It is our opinion, however, that if the universities would contravene the expressed legislative intention, they would be breaking faith with their expressed intentions to the Legislature and to the people of this state, quite possibly finding themselves legally estopped from so doing in addition.

The Court of Appeals and the trial court are affirmed as to the third sentence of § 20.

No costs, a public question.

SWAINSON and LINDEMER, JJ., took no part in the decision of this case.